# DAVISON *v.* DAVIS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KENTUCKY.

No. 100. Argued December 6, 7, 1887. — Decided March 19, 1888.

The payee of a promissory note gave to the promisor a receipt acknowledging it as given for the purchase of personal property to be delivered to the promisor on payment of his note. The note not being paid at maturity, the payee notified the promisor that he should not recognize his further claim to the property, and, after a further lapse of time without hearing from him, destroyed the note. *Held*, that the sale was conditional, not to be completed until payment of the note.

The remedy by bill in equity to compel a specific performance of a contract

to sell personal property upon the payment of a promissory note given by the other party, payable at a date after the making of the contract, is lost through the laches of the complainant, if he wait five years after the maturity of the note before filing his bill, and the property meanwhile greatly increases in value.

The court holds as the result of the transactions between the parties which are recited in its opinion, that, each being a holder of shares in a railroad company, they agreed that their respective interests should be joint and equal, and that the appellant should pay to the appellee the sum necessary to equalize the difference in cost between them; and that, this agreement not being carried out by the appellant, the parties substituted a new agreement, based upon the principal feature of the old one (that the appellee should sell to the appellant enough of his stock to make the holdings equal), but that each holding under the new agreement was to be in severalty and free from conditions.

IN EQUITY. Decree dismissing the bill. The case is stated in the opinion of the court.

*Mr. Samuel Shellabarger* and *Mr. Marc Mundy* for appellants. *Mr. J. M. Wilson* was with Mr. Shellabarger on his brief.

*Mr. Alexander P. Humphrey*, *Mr. St. John Boyle*, and *Mr. George F. Comstock* for appellee submitted on their briefs.

MR. JUSTICE BRADLEY delivered the opinion of the court.

The bill in this case was filed by Charles G. Davison and Marc Mundy to compel the defendant Davis to deliver to said Mundy 379½ shares of capital stock of the Louisville City Railroad Company, alleged to belong to said Mundy as assignee of said Davison, and to be held by Davis as security for the payment of a certain note of Davison for $6521.36, dated November 10th, 1876, and payable in one year, with interest at seven per cent, Mundy offering to pay the amount due on said note, and praying for an account to be taken to ascertain said amount.

The transaction out of which the controversy grew was as follows:

In November, 1873, Davison, residing in Louisville, Ken-

tucky, and Alexander H. Davis, of New York City, were each large owners of the capital stock of the Louisville City Railway Company, Davison owning about 800 shares and Davis about 1200, and they entered into the following agreement for the purpose of equalizing their interest, to wit:

"Memorandum of an agreement made this tenth day of November, 1873, between Chas. G. Davison, of the city of Lou., Ky., and Alex. Henry Davis, of the city of New York, N. Y., witnesseth:

"Whereas the said parties of the first and second parts, respectively, are the actual and equitable owners of certain shares of the capital stock of the Lou. City R. W., the said Davison holding or being entitled to hold about eight hundred and the said Davis holding or being equitably entitled to hold about twelve hundred shares of the said stock; and whereas the said parties of the first and second parts are desirous of equalizing their respective interests as between themselves, and also of acquiring possession of a greater amount of the said stock, now, therefore, it is hereby agreed that the stock now actually or equitably held by the parties of the first and second parts, respectively, shall be regarded as common property, each party being entitled to the one-half ownership of said stock for the considerations hereinafter to be mentioned.

"It is also agreed that all purchases of the said stock that may be made hereafter shall be thus made for the joint account of the parties to this contract, and shall be likewise held by them in common.

"It is furthermore agreed, as the consideration for the equalization of their respective interests, by the said parties to this contract, that the actual cost of the stock held by each party shall be computed as of this date, and a note given by the said Davison at any time upon demand for the amount which would be due from him for the equalization of said joint stock account, it being understood that two hundred and fifteen (215) shares of said stock now held by the said second party shall offset in the account a like number of shares held by the said first party.

"And it is furthermore agreed that in case of the death of

either of the parties to this contract, the survivor shall be entitled to purchase the stock of said deceased party, within one year from the time of such decease, at a price not exceeding twenty-five (25) dollars per share, if within twelve months from the date of this agreement, with an advance of ten (10) dollars per share for each succeeding twelve months.

"In witness whereof the parties of the first and second parts hereby attach their hands and seals this tenth day of November, 1873.

"(Signed)                  ALEX. HENRY DAVIS.
"(Signed)                  C. G. DAVISON.
" Witness: (Signed) E. H. SPOONER."

On the 11th of November, 1876, Davis made out a report or statement of the account between him and Davison, showing that he, Davis, held 1571 shares which cost $32,723.41, and that Davison held 812 shares which cost $19,680.69; and that to make them equal, Davis must transfer to Davison 379½ shares, and Davison must pay therefor the sum of $6521.36, or, as Davis expressed it, in the report, "That is the result as I make it — that I owe you 379½ shares of stock, and you owe me $6521.36, as of November 10, 1876."

This account was assented to by Davison, and on the 29th of January, 1877, the parties met, and Davison delivered to Davis his promissory note for said sum of $6521.36, dated November 10th, 1876, payable one year from date, with interest at seven per cent, and Davis, retaining the stock, delivered to Davison a receipt for the note in the words following, to wit:

"Syracuse, N. Y., Jan. 29, 1877.

" Received of C. G. Davison his note, dated Nov. 10th, 1876, for $6521.36, payable one year from date, with interest at 7 per cent. Said note is given me for the purchase of three hundred and seventy-nine and one-half shares of stock of the Louisville City Railway Co., now held by me, and to be delivered, upon payment of his note, to said Davison.

"ALEX. HENRY DAVIS."

The note became due on the 12th of November, 1877, but was not paid. On the 16th of September, 1882, Davison, by an indorsement on the receipt, transferred the 379½ shares mentioned therein to Mundy, who assumed to pay the debt due to Davis therefor; and in January, 1883, Mundy offered to pay Davis the amount due on Davison's note, and demanded the 379½ shares of stock — which Davis refused. Thereupon, on the 27th of March, 1883, the present bill was filed. It sets forth the circumstances of the transaction substantially as above stated, but contains allegations to the effect that the stock in controversy was regarded by the parties as belonging to Davison, and that he agreed and consented that the defendant might hold it by way of pledge or collateral security, for the payment of his note; whereas the defendant insists that the transaction was an agreement for a sale of the stock, to be assigned and transferred to Davison when it was paid for. The former take their stand on the terms of the original agreement of November, 1873; the latter on the receipt given in January, 1877. If the transaction relating to the 379½ shares of stock was a sale upon condition of payment of the note at maturity, the non-performance of the condition defeated it, if the vendor saw fit to avail himself of the breach, which he did. If it was only an agreement for a sale, the delay of the complainants in offering to pay the note and demanding a delivery of the stock would preclude them from asking for a specific performance of the agreement, even if the frame of the bill were adapted to such a decree — which is very doubtful, although it contains a prayer for further and other relief. The delay was upwards of five years after the note became due; and the circumstances which occurred enhance the right of the defendant to rely on that defence against any claim for specific performance. Both Davison and Davis were examined as witnesses, and the latter states positively that shortly before the maturity of the note, he wrote to Davison that if he did not meet the note at maturity he (Davis) should not recognize any further claim of his to the stock in question; and that some time in the year 1878 he considered the matter at an end, and destroyed the note. Davison, in his testimony, admits

that no communication took place between him and Davis in relation to the stock after February, 1878. At that time he states that a conversation occurred between them in which Davis offered to carry his (Davison's) stock in the company until it worked out, but that nothing was said about the particular stock in question. The conversation, as he afterwards explained, related to 579 shares bought by him of one Johnson, and not to the 379½ shares. Another circumstance of weight is the fact that the stock would not sell for more than twenty dollars per share until long after the note became due; and that afterwards, when Davis himself took hold of the road, the stock appreciated so as to sell for nearly or quite double that amount. It was after this appreciation of the stock in value, that Davison transferred his supposed interest to Mundy, who then made the offer to pay Davison's note and take up the stock. Under all these circumstances, the laches of Davison and Mundy is a perfectly good defence againt any claim of relief from the condition (if it was a sale upon condition); or for specific performance of the agreement (if it was an agreement for a sale). In *Brashier* v. *Gratz*, 6 Wheat. 528, 541, Chief Justice Marshall said: "This, then, is a demand for a specific performance, after a considerable lapse of time [five years] made by a person who had failed totally to perform his part of the contract; and it is made after a great change, both in the title and in the value of that which was the subject of the contract; and by a person who could not have been compelled to execute his part of it, had circumstances taken an unfavorable direction." The reason why the party seeking relief in that case could not be compelled to execute his part of the contract, was his pecuniary inability to execute it — a circumstance which also existed in the present case.

But, as before stated, the complainants contend that the nature of the transaction between the parties is to be gathered from the agreement of November 10th, 1873, and not solely from the receipt given in January, 1877; and that by that agreement the parties became joint owners of the stock then held by each, and of all that they or either of them might

afterwards purchase. That agreement was undoubtedly the basis of the settlement made in January, 1877; but it cannot be invoked to control the terms of that settlement. The agreement amounted to this, that the respective interests of the parties in the stock of the company should be joint and equal, Davison paying the amount necessary to equalize the difference of costs between them. It appears, from the evidence, that the stock held by the two would control the management of the company; and the object of the agreement, stated shortly, was that they should stand together and be equally interested; Davison being at that time president of the company, and Davis the largest stockholder. Up to January, 1877, Davison had never paid the difference in the cost of the stock. The parties then came to the settlement referred to. Each still held his own individual shares as at first, and as purchased afterwards, no transfers having been made. They now concluded, instead of holding the stock in common, to make an equal division of their aggregate shares; and to do this, Davis must transfer to Davison 379½ shares, and, according to the terms of the original agreement, the latter must pay therefor the sum of $6521.36. In making this change in their proposed relations, the parties treated the transfer of the 379½ shares as a sale, the terms of which are specified in the receipt of January 29th, 1877. Those terms are clear and unmistakable. It is expressly declared that the note was given for the purchase of 379½ shares of the stock of the Louisville City Railway Company, to be delivered to Davison upon the payment of his note. A mere receipt is subject to explanation; but an agreement, or contract, in a receipt is as conclusive as in any other paper executed between the parties. Therefore, although the object of the original agreement was, or may have been, a joint and equal ownership of stock, with right of purchase by the survivor, in case of death, yet it is apparent that this plan was abandoned, at the time of the settlement, for that of an equal division of the stock of both, to be held in severalty only. In other words, instead of the old contract, which had never been fully carried into effect, the parties entered into a new

contract based upon the principal feature of the old, that Davis should sell to Davison a sufficient amount of stock to make their holdings equal, but to be held in severalty, free from any conditions, and with liberty on the part of each to dispose of his stock as he should see fit; the price being fixed in accordance with the terms prescribed in the original agreement.

That this was the real nature of the transaction which took place in January, 1877, is apparent from the circumstances, and from the subsequent conduct of the parties. Davison, being in embarrassed circumstances, did not retain his stock, but had parted with it all as early as the spring of 1878, thus entirely ignoring the objects and purposes of the agreement of 1873. The answer of the defendant contains the following statement, to wit: "The respondent further says that said agreements were entered into by him in the belief and with the assumption that said Davison was the holder or entitled to hold about eight hundred shares, as represented by him, and respondent does not know how much of said stock said Davison held or was entitled to hold, but he never came into possession or control of about eight hundred shares or near that amount, and as early as the spring of 1878 ceased to be a stockholder; that he then turned over to the company whatever stock he held in part payment of his indebtedness to the company, and the intent and purpose of the agreement between said Davison and respondent wholly ceased and failed." This averment is substantially proved by the testimony of both parties, Davison and Davis. The former continued president of the railway company until February, 1878, but was not reëlected after that time. He had become indebted to the company, which had run down financially, and, as before said, parted with all his stock. It is plain, therefore, that the main purpose of the original agreement had failed and had been abandoned. The only thing we have to guide us, as to what the new contract was, is the receipt of January 29, 1877, the terms of which we have already adverted to. From those terms it is clear that the sale was not to be completed until the payment of Davison's note.

The language is, "said note is given me for the purchase of 379½ shares of stock now held by me and to be delivered, upon payment of his note, to said Davison." That such language amounts to conditional sale, or to an agreement for a sale on performance of the condition, see Benjamin on Sales, Book II, Chap. III, Rule III, (p. 252, second ed.,) and the cases there collected.

If this is a correct view of the case, it is plain that the only equitable remedy applicable to it is a bill for relief from the condition, or for specific performance. Both of these remedies, as we have seen, have been lost by the laches of the complainant.

*The decree of the Circuit Court is affirmed.*