(48 South. 1007.)

No. 17,332.

JOFFRION et al. v. GUMBEL.

(March 29, 1909.)

1. SPECIFIC PERFORMANCE (§ 90*)—CONTRACT TO CONVEY LAND.

The general rule is that he who seeks the performance of a contract for the conveyance of land must show himself ready, able, and willing to perform the contract on his part.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 228; Dec. Dig. § 90.*]

2. SPECIFIC PERFORMANCE (§ 99*)—LACHES OF PLAINTIFF.

Unreasonable delay in doing those acts which are to be done by him will justify and require a denial of that relief. Plaintiff praying for such relief must have instituted his suit within a reasonable time before any material change affecting the interest of the parties has taken place.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 299; Dec. Dig. § 99.*]

3. SPECIFIC PERFORMANCE (§ 100*) — LACHES OF PLAINTIFF.

It would be an unwarrantable exercise of discretionary power to allow one, holding a mere option to purchase, to lie by for a long time and speculate upon the fluctuating values of property and, after a substantial increase in their value, to enforce a conveyance in his favor at the original price.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 306, 307; Dec. Dig. § 100.*]

(Syllabus by the Court.)

Appeal from Twenty-First Judicial District Court, Parish of Pointe Coupee; Louis Bingaman Claiborne, Judge.

Action by Julie Michel Joffrion and others against Ferdinand Gumbel. Judgment for plaintiff, and defendant appeals. Reversed.

Albin Provosty and Lazarus, Michel & Lazarus, for appellant. Jacob Haight Morrison and Hewett Bouanchaud, for appellees.

## Statement of the Case.

NICHOLLS, J. The plaintiffs are the widow of Oscar Joffrion, as natural tutrix of two of the minor children, issue of their marriage, and the remaining plaintiffs are the major children of the said Oscar Joffrion and wife.

Oscar Joffrion died on the 28th of November, 1898. His succession was administered by the widow, who, having fully administered the same, has been discharged. She was separate in property from her husband by marriage contract.

The plaintiffs allege that on the 15th of March, 1895, by public act before Laycock, notary public for the parish of Pointe Coupee, duly recorded, Oscar Joffrion, acting by virtue of and under an agreement entered into with Ferdinand Gumbel, purchased in the name of said Gumbel a certain tract of land in the parish of Pointe Coupee known as the "Old Watkins Place" (which they described), paying therefor the sum of $502.50. That at the time of said purchase it was distinctly agreed and expressly understood by and between the said Ferdinand Gumbel and the said Oscar Joffrion that, while the title to the above-described property should be taken in the name of the said Ferdinand Gumbel, the said Ferdinand Gumbel should transfer, sell, and deliver to the said Oscar Joffrion one-half of said property for one-half of the purchase price paid therefor by the said Ferdinand Gumbel.

That the aforementioned agreement is evidenced by a certain written letter from Oscar Joffrion to Ferdinand Gumbel, and by a typewritten letter signed by Ferdinand Gumbel and addressed to Oscar Joffrion, the letter from Oscar Joffrion to Ferdinand Gumbel being dated March 6, 1895, and that from Ferdinand Gumbel to Oscar Joffrion being dated March 9, 1895.

That the aforementioned letter, signed by Ferdinand Gumbel and addressed to Oscar Joffrion, is now in the possession of petitioner, but that the signature of Gumbel to the same is almost entirely torn off, so much so as to render said signature difficult of identification; and that, because of the condition

of the signature, it would materially aid petitioners in the presentation and prosecution of this cause that Ferdinand Gumbel be requested by this honorable court to answer in writing, categorically and under oath, the interrogatories on facts and articles herein propounded to him, hereto annexed and hereof made a part.

That, acting upon the faith of the aforesaid agreement, Oscar Joffrion made the following improvements on property, which were paid for by Oscar Joffrion and petitioners, on the following dates, to wit: Twenty acres of fencing, made and paid for in the summer of 1895, and costing $150; 28 acres of fencing, made and paid for in the spring of the year 1895, and costing $180; 5 cabins, made and paid for in the year 1895, and costing $200 each; and 100 acres of land cleared in the years 1895 and 1896 and costing $15 per acre—making a total expenditure of $2,830.

That they, as the sole and only heirs of Oscar Joffrion, are entitled to the undivided one-half of the property hereinbefore described upon paying to Ferdinand Gumbel one-half of the price paid for same by Gumbel, as hereinbefore set forth, plus 5 per cent. per annum interest on said sum from the 15th day of March, 1895, to the 25th day of September, 1906; and that petitioners are further entitled to a judgment against said Gumbel, condemning him to pay to petitioners the sum of $1,415 with legal interest on $165 and $500 of said sum for the summer of the year 1895, and on $750 of said sum from the summer of the year 1896, until paid in full; same being one-half the costs of the improvements, plus legal interest as hereinbefore set forth.

That on the 25th day of September, 1906, through their agent and attorney in fact, Jacob H. Morrison, of the parish of Pointe Coupee, acting by virtue of a power of attorney executed before Hewett L. Bouanchaud, notary public, petitioners did tender to Ferdinand Gumbel at his office in the city of New Orleans, La., in the presence of notary public, duly commissioned and qualified for the parish of Orleans, and two competent witnesses, the sum of $402 in current money of the United States, same being one-half of the price paid for property by Gumbel, plus legal interest on same from March 15, 1895, to the date of said tender; and did then and there demand of the said Ferdinand Gumbel that he execute a title to petitioners of the undivided one-half of said property, and that he pay to petitioners the sum of $1,200 in settlement of the cost of one-half the improvements hereinbefore set forth, which demands of petitioners were refused and rejected by Gumbel, whereupon procès verbal of said demands and said refusal was made by notary who signed same, together with the witnesses and J. H. Morrison, on the 25th day of September, 1906.

That said tract of land is now fully worth the sum of $12,000, exclusive of the improvements hereinbefore set forth.

The premises considered, they pray that the said Ferdinand Gumbel be duly cited, and that, in due course of law and after due proceedings had, there be judgment ordering and directing Ferdinand Gumbel to sell and deliver to petitioners the undivided one-half of the property hereinbefore fully described, upon petitioners paying therefor the sum of $402; and that he be condemned to pay petitioners the full sum of $1,415, same being one-half the costs of the improvement hereinbefore set forth, with legal interest on $665 of said sum from the 1st day of August, 1896, until paid in full. And, in the alternative, petitioners pray that should this honorable court decline to compel the said Gumbel to specifically perform his share of the aforementioned agreement and give title to petitioners, as hereinbefore prayed for, then and in that case there be judgment condemning the said Gumbel to pay to petitioners the

full sum of $5,598, same being one-half the value of said property, minus $402, due from petitioners to Gumbel in settlement of one-half the purchase price of same and interest as aforesaid, with legal interest on said sum from the 25th day of September, 1906, until paid in full; and the further sum of $2,830 in settlement of the entire costs of the improvements hereinbefore set forth, with legal interest on $1,230 of said sum from the 1st day of August, 1895, and legal interest on the remainder of same from the 1st day of August, 1896, until paid in full.

And petitioners further pray for all costs and general relief. Petitioners filed later an amended petition, in which they alleged that they had inadvertently alleged in their original petition "five cabins made and paid for in the year 1895 and costing $200 each"; that this was incorrect in part; that only $500 of said amount of $1,000 was paid to Gumbel by Oscar Joffrion in the year 1895, and that the balance of said amount of $1,000 was paid by petitioners in the year 1902.

Defendant answered, denying generally all of plaintiffs' allegations, except in so far as admitted in his answer to the interrogatories on facts and articles. Further answering, he alleged that it is true that respondent did purchase the place described in the petition herein, and it is true that the late Oscar Joffrion in his letter of March 6, 1895, did suggest to respondent to purchase the said tract of land, and that respondent in his letter of March 9, 1895, to the said Oscar Joffrion, did agree to purchase the said place, and that it is further true that in his letter to respondent of March 6, 1895, Oscar Joffrion did say:

"Now, if you wish to buy I will put it in your name but you will sell me one half for the amount of one half of what it costs."

And it is further true that respondent did in his letter of March 9, 1895, say that:

"If you can purchase the old Watkins place for $475.00, I will take it, I will sell you one half of the place for one half of the cost."

Respondent shows that under the said letters respondent purchased for himself and became the sole and absolute owner of the said land, and that he did agree to sell to Oscar Joffrion one-half interest in the place, at the price of one-half of what the place cost respondent. Respondent denies that Oscar Joffrion ever acquired any interest whatever in said place under respondent's purchase thereof, and plaintiffs herein, by the form of their demand and the prayer of their petition, admit that the said Oscar Joffrion never did acquire any interest in said land, and only claim that Oscar Joffrion was in a position where he had the right to buy and to so acquire a one-half interest in said land by paying one-half of the cost thereof; which plaintiffs now offer to do. That Oscar Joffrion, after the purchase of the said place, managed it for respondent; that he took charge of the improvements on the land and of the cultivation thereof; and respondent shows that respondent paid for all improvements of every kind on the land whether, in the way of draining, building upon, fencing, or in otherwise improving the property. That Oscar Joffrion never at any time during his life offered to purchase any part of the land under his option, and never claimed or pretended that he, Oscar Joffrion, had any right to the lands, but always admitted in the fullest manner that the land was the property of respondent. That all the rents and revenues of the property were received and used by respondent as his property, and that Joffrion never claimed or invested in himself the right to retain any part of the rents and revenues. That all the taxes and public charges of all and every kind accruing against the property were paid by respondent, and Joffrion never offered to pay any part of the said taxes or public charges.

That ever since the purchase of the lands he has been the sole and absolute owner thereof, and that Oscar Joffrion has not and never

had any interest in the said land, and that he never at any time availed himself of his option to purchase said interest in said land or sought to avail himself thereof. That Joffrion has by his failure to avail himself of his option and by his conduct waived and relinquished all claims that he might have had to a sale of a one-half interest in property from your respondent to him. That all the rights of Joffrion or of his succession, if any they had, upon the contract, are prescribed under the prescriptions of 3, 5, and 10 years. The premises considered, respondent prayed that the petition and demand of the plaintiffs herein be rejected at their costs; and respondent further prays for all further and general and equitable relief in the premises.

On the 11th of September, 1908, the district court rendered judgment in favor of plaintiffs Emile Joffrion, Edward Joffrion, and the minors Fulgence Joffrion and Albanie Joffrion, decreeing them to be the owners in indivision in the proportion of one-tenth each respectively, of the following described property described in plaintiffs' petition (describing it), upon each of the above-named plaintiffs paying to Ferdinand Gumbel the sum of $42.20, or one-tenth of the sum of $402. The judgment further ordered the defendant, Ferdinand Gumbel, to pass title accordingly of the said property to the said Emile Joffrion, Edna Joffrion, and the minors Fulgence Joffrion and Albanie Joffrion, and in default of the said Ferdinand Gumbel's complying with the terms of this judgment, within 30 days from this date, considering that the said property above described is fully worth the sum of $8,000, exclusive of the improvements thereon, it is ordered that he pay to each of the following named plaintiffs, Emile Joffrion, Edna Joffrion, and the minors Fulgence Joffrion and Albanie Joffrion, the sum of $800, with legal interest thereon from the date of judicial demand. It further ordered that the plea of prescrip-

tion interposed by the defendant herein be and is hereby sustained as to Mistress Philomene Joffrion, wife of Camille D. Lallande, and her demand rejected.

It ordered that the demand of plaintiffs for the value of the improvements of the said property, not having been established with certainty, be, and the same is hereby, rejected as in case of nonsuit, reserving to the said plaintiffs, Emile Joffrion, Edna Joffrion, and the minors Fulgence Joffrion and Albanie Joffrion the right of suing for said improvements; that to the said defendant, Ferdinand Gumbel, it is hereby reserved the right to sue the said last-named plaintiffs for the improvements on said property which may have been made by said defendant. It further ordered, adjudged, and decreed that the defendant, Ferdinand Gumbel, pay all the costs of this suit.

Defendant has appealed.

Mrs. Philomene Joffrion, wife of C. D. Lallande (one of the plaintiffs), was granted a devolutive appeal, but failed to perfect it by executing an appeal bond.

The interrogatories on facts and articles propounded to the defendant and the answers thereto are given below:

"Int. 1. State your name and residence.

"Ans. My name is Ferdinand Gumbel; I am a commission merchant and cotton factor, and reside in the city of New Orleans.

"Int. 2. If you say that your name is Ferdinand Gumbel, that you live in the city of New Orleans, La., and that you are engaged in business as a cotton factor and commission merchant, either individually or as a member of some firm or corporation, state how long you have been thus engaged in business, and state particularly whether or not you were engaged in said business, in the city of New Orleans, La., under the firm name of Ferdinand Gumbel & Co., throughout the month of March, 1895?

"Ans. I have been engaged in business for about 24 years, and was engaged in that business as a member of the firm of Ferdinand Gumbel & Co. through the month of March, 1895.

"Int. 3. Were you acquainted with the late Oscar Joffrion, of the parish of Pointe Coupee, whose heirs are the petitioners in the petition to which these interrogatories are annexed, and, if yes, state how long you knew him, and wheth-

er or not you, either individually or as a member of your firm, or both, ever had any business transaction with him?

"Ans. Yes, I was well acquainted with the late Oscar Joffrion of Pointe Coupee parish, and had known him many years before his death. My firm of Ferdinand Gumbel & Co. had had business relations with Oscar Joffrion and business transactions with him for a number of years.

"Int. 4. Is it not a custom of yours to retain and preserve letterpress or carbon copies, or any other form of copy of all letters of an important or business character, written by you, and especially such letters as may evidence an obligation assumed by you towards some one else, and was not such your custom throughout the month of March, 1895? .

"Ans. Yes.

"Int. 5. Is it·not a custom· of yours to preserve all letters of an important or business character received by you, and especially such letters as may evidence an obligation assumed by the writers of same towards you, and was not such your custom throughout the month of March, 1895?

"Ans. Yes.

"Int. 6. Did you not receive a letter from the said Oscar Joffrion dated March 6, 1895, and reading literally or in substance as follows—

" 'Lakeland P. O. March 6th, 1895.
" 'F. Gumbel, New Orleans, La.

" 'Dear Sir: I spoke to you when in the city in regard to the old Watkins place. I know a way that I can get it for about $475.00. There is 60 arpents clear and ready to work and 225 acres that has been work and can be cleaned for little or nothing. They have two good cabins on the place; they cost at lease $400.00. Now if you wish I will buy it in your name, but you will sell me ½ for the amount of ½ what the place cost. The place joins your Sellers place and also my Deloche place. Therefore I can get for next year 300 acres on them. Let me know at once what to do.

" 'Truly,     O. Joffrion.

" 'N. B. ' The tract contains 325 acres.'

"And if you say yea, have you not that particular letter in your possession or under your control at the present time, and, if yea, annex same to your answer to this interrogatory?

"Ans. Yes, I did receive a letter, a substantial but not a literal copy of which is contained in interrogatory No. 6. I have kept that letter in my possession, and have it now, and I hereto attach the said letter in the original. Said letter is written and signed by Oscar Joffrion.

"Int. 7. Did you not dictate, sign, and address, or have addressed, a typewritten letter to the said Oscar Joffrion, dated New Orleans, La., March 9, 1895, and reading as follows:

" 'New Orleans, La. March, 9th, 1895.
" 'Mr. Oscar Joffrion, New Roads, La.

" 'Dear Sir: In reply to your favor of the 6th, I would say if you can purchase the old Watkins place at $475.00 I will take it but before you consummate the sale, have Mr. O. Provosty to look over the records and see that the title is good as this is very important and unless the title is good I do not wish to purchase the place therefore follow my instructions and as you say there are two new cabins on the place I think same cheap enough for $475.00. I will resell you one half of the place at one half of the original cost whenever the title is effected. Awaiting your reply.

" 'We remain, truly yours,
" 'Ferdinand Gumbel.'

"And, if you say yea, have you not a letterpress, carbon, or any other copy of that particular letter, and, if yea, annex it to your answer to this interrogatory?

"Ans. On March 9, 1895, I wrote to Oscar Joffrion the letter as copied in said interrogatory No. 7, in reply to Oscar Joffrion's letter of March 6, 1895, to me. As requested, I attach to this answer, as part hereof, a copy of my said letter of March 9, 1895.

"Int. 8. Did not the said Oscar Joffrion purchase the property, the subject of the letters mentioned in interrogatories numbered 6 and 7, in your name, in pursuance of the understanding between him and you as set forth in said letters, paying therefor the sum of $502.50; and did you not accept said purchase as satisfactory?

"Ans. Yes, Mr. Joffrion did purchase the property, the subject of the letters mentioned in interrogatories Nos. 6 and 7, and I believe he paid about $502 therefor. I did accept the said purchase as satisfactory. I attach as part of my answer to this interrogatory a letter from Mr. Oscar Joffrion of date March 6, 1895, informing me of his purchase of the property.

"Int. 9. Did not Oscar Joffrion make improvements on this property at his own expense in the shape of clearing land, building cabins and fences, and digging ditches, and, if yea, state the nature and cost of these improvements or anything else you may know concerning said improvements?

"Ans. After purchasing the said property Mr. Joffrion managed it and attended to it for me, and superintended the improvements on the property, but he made no improvements, that I know anything of, at his own expense. I paid for the cost of clearing the land, building the cabins, fences, and digging the ditches. Mr. Joffrion would incur expenses in clearing the land, or building on it, and would then draw upon me for the amount of money that he needed to pay for the expenses. His drafts contained, in his own handwriting, a statement of the cause for which they were drawn, showing that they were drawn for disbursements and expenses on the Watkins place. In this way I paid:

"On August 3, 1895, Mr. Joffrion's draft on my firm for $20 for clearing land on Watkins place.

"On August 22, 1895, Mr. Joffrion's draft on

my firm for $40 for clearing land on Watkins place.

"On September 8, 1895, Mr. Joffrion's draft on my firm for $50 on account of building house on Watkins place.

"On September 18, 1895, Mr. Joffrion's draft on my firm for $101.60 for lumber for two cabins on Watkins place.

"On September 23, 1895, Mr. Joffrion's draft on my firm for $33.05 'for clearing land on Watkins place.'

"On October 5, 1895, Mr. Joffrion's draft on my firm for $50 'for balance due on two cabins on Watkins place.'

"On May 7, 1896, Mr. Joffrion's draft on my firm for $79.03 'for wire for the old Watkins place.'

"On July 21, 1896, Mr. Joffrion's draft on my firm for $65 'for Watkins place, will send account.'

"All of these drafts I attach to this answer as part hereof. As far as I know, I paid for every dollar of improvements of every kind, made on the Watkins place, for Mr. Joffrion had no money at that time with which to pay for these improvements, and owed my firm considerable money. The general understanding between him and myself was that I should pay for these improvements, whether for building cabins or clearing land, or draining or fencing the place, and I always believed and still believe that he charged me for all the improvements of every kind that were made on the place. He was not in a position to expend any money of his own, and he never claimed to me, during all his lifetime, that he had spent any money on these improvements, or that he had any claim against me for money disbursed by him for making improvements on the Watkins place.

"After the year 1896, * * * I paid drafts of Oscar Joffrion for improvements and expenditures on the Watkins place, as follows:

"Drawn: On December 12, 1897, I paid his draft on my firm for $150 'to account of Ferdinand Gumbel for hauling lumber and carpenter work on Seibert & Watkins.'

"On December 12, 1897, I paid his draft on my firm for $105 to account F. Gumbel for Watkins place.

"On January 20, 1898, I paid his draft on my firm for $46 'for building the houses on Watkins place.'

"On February 16, 1898, I paid his draft on my firm for $11 'for Watkins, hauling lumber.'

"Mr. Joffrion represented me in managing the Watkins place.

"I attach to my answer letter from Mr. Joffrion as follows: One of August 9, 1895, in which he says, 'I received your letter in regard to drawing too much,' showing that he was then overdrawn and considerably in our firm's indebtedness.

"I also attach copies of my letter to him of date July 30, 1895, August 1, 1895, and August 7, 1895, all of which show that he was largely in my debt at the time. As the only money he had, as far as I know, was obtained from

me, he was without money to pay for any interest in the Watkins place. He was continually in my debt—that is to say, in debt to the firm of Fred. Gumbel and Company—from 1895 until the time of his death, and was without means, unless he had borrowed from me, to pay for the improvements on the plantation or to pay for his interest in the place.

"I also inclose letter from him of May 10, 1895, in which he states that his draft for $78 is 'for 24 rolls of wire for fencing on the Watkins place.'

"Mr. Joffrion always recognized me as the owner of the place, and that I controlled and paid for the expenses and improvements thereon.

"On September 10, 1895, I wrote him a letter, a copy of which is attached hereto, and on September 13, 1895, Mr. Joffrion wrote me a letter, in reply to mine of September 10th, the original of which letter of September 13, 1895, I attach to my answer as part hereof.

"These letters show that Mr. Joffrion recognized me as the owner of the place, and looked to me for payment of the expenses and costs incurred thereon.

"I may add that Mr. Joffrion never at any time during his lifetime asked me to convey to him an undivided half of the Watkins place, and never at any time claimed any rights under his letter to me of March 6, 1895, and my answer to the said letter of March 9, 1895. I always paid the taxes on the Watkins place, and all the expenses of every kind; and all the rentals and income of the place were collected by Mr. Joffrion and turned over to me, as owner of the place."

Attached to defendant's answer to the interrogatories propounded to him was the following letter from Oscar Joffrion:

"New Roads, La. March, 17, 1895.
"Ferdinand Gumbel, New Orleans, La.

"Dear Sir: Inclosed please find patents for Max Land I riten the land would cost $475, but I thought tract contained 320. As you see it contained 335 acres, it made a different in the price of 27 dollars. I drow on for $465.30, but I deducted the taxes which is $42.20. I see that cotton as gone up. If you think it best to sell my cotton sell it.

"Send me for the Sicard land 3 bundle of barb wire.

"Truly,                                           Oscar Joffrion."

### Opinion.

Joffrion died on the 17th of November, 1897. Up to that time he had manifested no intention to avail himself of the right to purchase one-half of the property on payment of one-half of the original costs, nor had he

claimed any right in, to, or upon the property. He was managing Gumbel's properties at that time, and had been for many years before. At that date his children were all minors. They and those representing them, as Joffrion had done, were silent as to any right or claim in respect to this property until the 25th day of September, 1906, when they tendered Gumbel the sum of $402 as "being one-half the price of the property plus legal interest on same from March 15, 1895, to the date of said tender, and demanded of him to execute a title to one half interest" in the property which he had so purchased.

They also demanded that he should pay them the sum of $1200, as "being one-half costs of improvements erected on said property by Oscar Joffrion."

Gumbel refused to accept the tender, or to make payment of the sum demanded. This suit followed.

The defendant in his letter of March 9, 1895, consented to resell to Joffrion one-half of the place at one-half of the original cost "whenever the title is effected."

Gumbel was not the owner of that property at that time. When the property was bought by him, Joffrion did not become ipso facto the owner of one-half of the property. It could become his only if he should elect to avail himself of that promise of Gumbel by purchasing the property at the price mentioned in the letter. In order to acquire the ownership it was necessary that an act of sale should be passed and the price paid as stipulated it should be paid. No exact time having been fixed by the parties for the execution of that act, the law would assume that it should be done "forthwith," by which term is meant that it should be done within a reasonable time thereafter, as the parties were presumed to have contemplated this should be done. Until this act should be executed, Gumbel remained the owner of the property, with all the benefits resulting from ownership

and with all disadvantages resulting from that fact. In 1895, properties in Pointe Coupee were of very little value, even payment of the taxes thereon being an onerous obligation. This whole property was valued at and actually sold at $502. In September, 1906, the valuation placed upon it by the district judge was $8,000. To that great change in values the plaintiffs contributed nothing. They had paid not one dollar towards the acquisition of the property, nor were they the owners of the same, and by reason of that fact itself entitled to the benefit of the increase. The benefit of that increase legitimately inured to the owners.

When Gumbel consented to sell one-half of the property to Joffrion at the small price which he gave his consent to do, it was with the implied condition arising out of the situation that he would sell to him at that price provided that he should elect to purchase and should comply with the obligations attached to his right to buy, within a reasonable time, before values should change.

Holding a position which threw upon him necessarily the obligation of demanding a specific performance by Gumbel should he decline to make a transfer of the property, he certainly knew that he must be prepared to meet the obligations imposed upon a party seeking to avail himself of that particular remedy, and must have known or be held to have known the consequences of not being able to comply with such obligations. It is a well-recognized rule that:

"A bill for specific performance is addressed in the extraordinary jurisdiction of a court of equity to be exercised according to its discretion. Van Dorn v. Robinson, 16 N. J. Eq. 256. The general rule is that he who seeks performance of a contract for the conveyance of land must show himself ready, desirous, prompt, and eager to perform the contract on his part. Therefore unreasonable delay in doing these acts which are to be done by him will justify and require a denial of relief. No rule respecting the length of delay which will be fatal to relief can be laid down, for each case must depend on its peculiar circumstances. Meidling v. Trefz, 48 N. J. Eq. 638, 22 Atl. 824; New Barbadoes v. Vree-

land, 4 N. J. Eq. 157; Cooper v. Carlisle, 17 N. J. Eq. 525; Houghwout v. Boisaubin, 18 N. J. Eq. 315; Merritt v. Brown, 19 N. J. Eq. 286; Id., 21 N. J. Eq. 401; Crane v. Decamp, 21 N. J. Eq. 414.

"It is equally well settled that one who seeks specific performance of such a contract must institute his suit within a reasonable time, and before any material change affecting the interest of the parties has taken place. Penrose v. Leeds, 46 N. J. Eq. 294, 19 Atl. 134.

"These doctrines are applicable to the case before us. It exhibits an excessive and unreasonable delay not only in giving notice of satisfaction with the title and intent to require a conveyance, but also in the application for relief. In the time which has been permitted to elapse a material increase in the value of the subject-matter of the contract has taken place. It would be an unwarrantable exercise of discretionary power to allow one holding a mere option to purchase to lie by for so long a time and speculate upon the fluctuating values of urban lots, and, after a substantial increase in their value, to enforce a conveyance in his favor at the original price now inadequate.

"Delay in such cases may doubtless be explained, and, in some circumstances, excused, but neither explanation nor excuse can be discovered in this case."

In Brashier v. Gratz, 6 Wheat. 528, 5 L. Ed. 322, which was a bill for specific performance, where no time limit was made in the contract, the court (Marshall, C. J.) said:

"The appellant insists that, in equity, time is not of the essence of the contract; that it is in part performed, and that his failure to pay the purchase money until December, 1813, when the tender was made, is justified by the circumstances of the case.

"The rule that time is not of the essence of the contract has certainly been recognized in courts of equity, and there can be no doubt that a failure on the part of a purchaser or vendor to perform his contract on a stipulated day does not of itself deprive him of his right to demand a specific performance at a subsequent date, when he shall be able to comply with his part of the engagement. * * * But the rule is not universal. Circumstances may be so changed that he who is injured by failure of the other contracting party cannot be placed in the situation in which he would have stood had the contract been performed. Under such circumstances, it would be iniquitous to decree a specific performance, and a court of equity will leave the parties to their remedy at law."

And again:

"This, then, is a demand for specific performance after a considerable lapse of time, made by a person who has failed totally to perform his part of the contract; and it is made after a great change, both in the title and in the value, of that which was the subject of the contract, and by a person who could not have been compelled to execute his part of it, had circumstances taken an unfavorable direction."

In Richardson v. Hardwick, 106 U. S. 252, 1 Sup. Ct. 213, 27 L. Ed. 145, where a bill in equity was filed by R. to compel the specific performance of a contract relating to land, wherein R. covenanted with H. by making certain payments within a period named that he might become equally interested in them, the court said:

"The written contract gives the privilege, or, as counsel call it, 'an option,' to become equally interested in the land by paying one-half the purchase money, etc., within two years after its date. The contract of itself did not vest in him any interest or estate in the lands. It merely pointed out the mode in which he might acquire an interest, namely, by paying a certain sum of money within a certain time. He did not pay the money within the time limited, and has never paid it or any part of it, and 18 months before the commencement of this suit Hardwick gave him notice that his option to purchase had been lost, and told him that he had no interest in the land.

"It is clear from the terms of the contract that Richardson was not bound by it. He did not agree to purchase any share in the land, or to pay Hardwick any money. The contract gave Hardwick no cause of action against Richardson. The latter was not bound to become interested in the land or to any money thereon, unless he chose to do so.

"In suits upon unilateral contracts, it is only where the defendant has had the benefit of the consideration for which he bargained that he can be held bound. (Authorities.)

"In this case, Richardson having failed to pay the money or any part of it within the time limited, the privilege accorded him by contract was at an end, and all the rights under it ceased."

On this same subject, see Bartley v. City of New Orleans, 30 La. Ann. 264; Capo v. Bugdahl, 117 La. 992, 42 South. 478; Green v. Covillaud, 10 Cal. 317, 70 Am. Dec. 725; Smith v. Lawrence, 15 Mich. 499; Stone v. Harmon, 31 Minn. 512, 19 N. W. 88; Fitzpatrick v. Woodruff, 96 N. Y. 561; Magoffin v. Holt, 1 Duv. (Ky.) 95; Davison v. Davis, 125 U. S. 90, 8 Sup. Ct. 825, 31 L. Ed. 635; Hanly v. Watterson, 39 W. Va. 214, 19 S. E. 536; Larmon v. Jordan, 56 Ill. 204.

123 LOUISIANA REPORTS.

Defendant urges that, Joffrion having died without availing himself of the right to buy the property at the price fixed, his representatives could not avail themselves of that right thereafter; citing Civ. Code, art. 1810.

We have not discussed the question from that standpoint, for, assuming that the heirs had the right to avail themselves of that "conditional right," they did so under the attendant condition that they should carry out the obligation imposed on their author of executing the agreement within a reasonable time, and not wait until values had changed to the injury of the party proposing to sell.

The judgment complained of is erroneous, and must be reversed.

For the reasons herein assigned, it is ordered, adjudged, and decreed that the judgment appealed from be, and the same is, annulled, avoided, and reversed, and the demand of the plaintiff is rejected and dismissed at their costs.