No. 12,193.

JOHNSON *v.* JOHNSON.

(286 Pac. 109)

Decided March 10, 1930. Rehearing denied March 31, 1930.

Messrs. PONSFORD, PENDER & LARWILL, for plaintiff in error.

Messrs. PERSHING, NYE, TALLMADGE & BOSWORTH, Mr. N. A. HUTCHINSON, for defendant in error.

*In Department.*

MR. JUSTICE BUTLER delivered the opinion of the court.

ARTHUR C. Johnson sued Marie F. Johnson for specific performance of a contract for the sale of corporate stock. Judgment went against him; hence this writ of error.

On August 13, 1919, the plaintiff and his brother, Fred P. Johnson, owned all of the capital stock (3,000 shares) of the Record Stockman Publishing Company, the former owning 1,501 shares, and the latter 1,499. On that date they made the following contract: "Whereas, it is the desire of Fred P. Johnson, party of the first part herein, and Arthur C. Johnson, party of the second part, to so adjust their respective interests in the Record Stockman Publishing Company of Denver, Colorado, that a majority of the shares of that concern shall be held by the party of the first part during his lifetime and that such controlling interest at his death shall pass to the party of the second part if he still be living. Therefore, for and in consideration of one dollar ($1.00) in hand paid, and in further consideration of the sale by the party of the second part of one hundred (100) shares of the stock in the Record Stockman Publishing Company to Willis N. Fulton, thereby leaving the majority ownership of stock in the said Record Stockman Publishing Company in the hands of the party of the first part, it is hereby contracted, stipulated and agreed by the party of the first part, his heirs and assigns, that the party of the second part, at any time considered proper in compliance with the above mentioned purpose, shall have the right to purchase one hundred (100) shares of the stock of the said Record Stockman Publishing Company held by the party of the first part, his heirs or assigns, at a price not to exceed fifteen dollars ($15.00) per share. It is fur-

ther agreed that in the event of the death of the said party of the second part prior to the death of the party of the first part this contract shall become null and void and that no further right of this nature shall exist against the holdings of the said party of the first part, his heirs or assigns, in the Record Stockman Publishing Company." Pursuant to the contract, the plaintiff sold to Fulton 100 shares of the stock.

Fred died November 8, 1922. His will, which left all of his stock in the company to his widow, Marie F. Johnson, the defendant, was admitted to probate December 4, 1922. The will named J. B. Foley, the brother of the defendant, as executor, and he served as such until the estate was closed in May, 1926. Foley acted as the defendant's agent in all matters concerning her stock in the company. Up to within a short time before Fred's death, Fred and the plaintiff managed the business of the company, and after Fred's retirement, due to ill health, the plaintiff continued in the management. Since Fred's death the directors have been the plaintiff and the defendant's brother, J. B. Foley, and her son, Mahlon B. Johnson.

The plaintiff testified that about two months after Fred's death the plaintiff called Foley's attention to the contract and the desire of the plaintiff "to act on its terms" at the proper time; that at the request of Foley, the plaintiff handed him the contract, which was copied by Foley and returned to the plaintiff; that some time in 1924 the plaintiff had a conversation with Foley, in which the plaintiff suggested that he begin taking up the 100 shares, possibly taking up and paying for 50 shares first, then taking up the other 50 shares a little later; that the plaintiff suggested that the matter could be expedited if Foley would allow him to make a personal loan from the Georgetown Bank, which Foley represented, to which Foley agreed; that Foley sent him a blank note from Georgetown with a statement, to fill out the same, and stated that the money would be sent to the plaintiff so that he could make partial payment of the purchase

price for the 100 shares; that the arrangement was not carried out for the reason that the funds that the plaintiff had intended to devote to the payment for the stock had to be placed elsewhere, and the matter was allowed to drift; that the price agreed to be paid for the stock at that time was $15 a share; that the plaintiff was to start on a payment of $750 for 50 shares; that the general understanding was that the remaining 50 shares were to be taken up as soon as possible; and that he believes he made the statement that if Foley could not deliver the shares as executor, or should not deliver them, they could be delivered at the close of the estate, assuming that the estate would soon be closed. Foley testified that it was at least six months after Fred's death that the plaintiff showed him the contract; that all that was said by the plaintiff at the time was, ''You know I have this contract,'' and that he permitted Foley to make a copy. Foley also testified: ''In Mr. Johnson's testimony he said he negotiated with me for some of that stock. I do not recall ever having such a conversation with Art.'' Disagreements arose over salaries and dividends, and on August 23, 1927, the plaintiff, by letter to Foley, indicated a desire to purchase the 100 shares, stating, among other things, ''In possibly disposing of my interest in the paper of course I am entitled to exercise a controlling interest through the purchase of 100 shares belonging to Fred, his heirs or assigns.'' On September 3, 1927, Foley wrote a letter to the plaintiff, in which he said: ''I note what you say about the possibility of disposing of your interest, and in that event you would want the control. I am somewhat surprised to think that you would even think of doing such a thing, particularly in view of the fact that matters have been left practically in your hands since Fred's death, to the injury of Marie's interest. Certainly we would never consider disposing of our interest were it to in any way jeopardize your holdings, and the suggestion that you might try to do so is surely a surprise to me. In view of this attitude we have decided

not to dispose of any of our stock, and so far as the so-called agreement is concerned, I am of the opinion it is of no value, and never has been, on the theory that a person cannot bind his heirs. And in addition to this, if you ever did have any right under the so-called agreement you have forfeited it by failure to exercise it during the administration of Fred's estate. * * * Should you desire to work on a sale of the whole business we would co-operate with you to the fullest extent, but certainly would not consider giving over control and thereby leave us holding the sack." On January 20, 1928, the plaintiff commenced this suit.

1. Counsel for the defendant do not press the point, suggested by the trial court, that the contract is an invalid restriction on the power of alienation. It would seem that the contract is not open to this objection. *Model Clothing House v. Dickinson,* 146 Minn. 367, 178 N. W. 957; *Fitzsimmons v. Lindsay,* 205 Pa. St. 79, 54 Atl. 488.

2. The corporation is a close corporation. The stock has no fixed or market value, and is not quoted in the commercial reports or sold upon the stock boards. The 100 shares in question are essential to the control of the corporation. In such circumstances an action for damages would not afford adequate relief; hence a suit for specific performance will lie. *Frue v. Houghton,* 6 Colo. 318.

3. The defendant's plea of estoppel was insufficient in that it failed to allege that the defendant was misled to her disadvantage by some act or omission of the plaintiff. The evidence, also, failed to prove the elements of estoppel. *Davis v. Fruita Mercantile Co.,* 74 Colo. 247, 220 Pac. 983; *Williams v. Hankins,* 75 Colo. 136, 225 Pac. 243.

4. Defendant's counsel contend that as the plaintiff's demand was not filed with the county court, it is barred by the statute of nonclaim, C. L. §5331. So far as his rights against the defendant are concerned, it was not necessary for the plaintiff to assert his rights in the

probate proceeding. He had an option—a right to purchase—that he did not exercise during the time the estate was being administered. He could have exercised his option while the estate was being administered, in which event he could have enforced the contract against the executor, assuming of course, that he exercised his option while it was still in force (*O'Donnell v. Chamberlin,* 36 Colo. 395, 91 Pac. 39, 10 Ann. Cas. 931), but he was not obliged to proceed in that way, and he chose not to do so.

5. Counsel for the defendant contend that upon the probate of the will the defendant became a trustee of an implied trust, and that as suit was not commenced within five years thereafter to enforce the trust, it is barred by C. L. section 6404. We cannot uphold the contention. When the defendant, by the terms of the will, became the owner of the stock, she acquired the stock subject to the plaintiff's right to purchase it according to the terms of the option. During the life of the option the plaintiff had the right to exercise it, and upon doing so, he would be entitled to enforce the contract against the defendant the same as he could have enforced it against Fred if Fred had not died. The doctrine of constructive trusts, referred to by the trial judge, does not apply; nor does the doctrine of implied trusts, suggested by counsel for the defendant. No cause of action could arise until the plaintiff exercised the option to purchase and the defendant refused to sell. If the option was in force when the plaintiff attempted to exercise it and when the defendant refused to sell, a cause of action accrued, and as the suit was commenced within five years thereafter, it would not be barred by the statute.

6. We come now to the most serious question presented by the record. Counsel for the plaintiff contend, and counsel for the defendant deny, that the plaintiff exercised his option during its life. The plaintiff's counsel suggest that this is an affirmative defense, and cannot be insisted upon because not pleaded. In this they are mistaken. It is not an affirmative defense. To entitle

himself to the relief sought, the plaintiff must allege and prove that he exercised his option within the time limited.

■■ The purpose of the contract was to secure the controlling interest in the corporation to Fred during his lifetime, and thereafter to the plaintiff should he survive Fred. The plaintiff was given the right to purchase the stock "at any time considered proper in compliance with the above-mentioned purpose." That means within a reasonable time, considering all the circumstances. We cannot say, as a matter of law, either that the plaintiff did or that he did not act within a reasonable time, considering all of the circumstances. The evidence with reference to some of the circumstances is in conflict. The question, therefore, was for the trial court to determine. The trial court, however, found for the defendant on the ground that the law does not enforce contracts that restrain the alienation of personal property after the death of the owner, such as this contract attempts to do, and that a constructive trust arose at the time the defendant acquired title upon the probate of the will on December 4, 1922, and therefore the suit, having been commenced on January 20, 1928, is barred by the five-year statute of limitation (C. L., §6404). These propositions, as we have seen, are untenable. In the opinion the trial judge said: "I am afraid that he (plaintiff) has slept on his rights in this matter because of the fact that he did not, after his brother died and this will was probated, proceed to enforce the contract. He was lulled to sleep, to be true, by the action of the executor himself, who discussed this matter with him, who never at any time indicated, except in 1927, that this contract was to be repudiated; that was very nicely concealed and kept quiet and nothing said and years allowed to lapse while the statute of limitations was running." The judge was not construing the terms of the option in order to determine how long it continued in force, but was applying the doctrine of laches, or the statute of limitation, or both, to what he held, in effect, to be a suit to enforce a constructive trust arising upon

the probate of the will. The case was decided upon an erroneous view of the law, leaving undetermined the controlling question of fact, namely, whether, considering all the circumstances, the plaintiff exercised his option within a reasonable time. This is made so clear in the trial judge's opinion, that the usual presumption that the court found all facts necessary to sustain the judgment is overcome.

The judgment is reversed, and the cause is remanded for further proceedings in harmony with the views expressed in this opinion.

MR. CHIEF JUSTICE WHITFORD, MR. JUSTICE MOORE and MR. JUSTICE BURKE concur.