ODOM, Justice.
 

 George B. Oliver died on October 23, 1934, leaving property which he disposed of by last will valued, according to the inventory, at $46,532.48. The Commercial National Bank of Shreveport, named executor in the will, qualified and in due course filed its account, which was opposed by Charles M. Lee on the ground that he was a creditor of the succession in the sum of $8,266, and that he had presented his account to the executor, but that the same was not allowed.
 

 In his petition of opposition to the account, Lee alleged that from July 1, 1923, to the date of Mr. Oliver’s death on October 23, 1934, he had at the request of Mr. Oliver rendered daily and continuous services for him, for which he had never been paid; that his services were valuable to Mr. Oliver and that Mr. Oliver repeatedly
 
 *29
 
 told him that in lieu of payments for such services as they were rendered, he (Oliver) would take care of him (Lee) liberally in his will; that the services were rendered under the belief, induced by Oliver’s statements and promises, that he (Lee) would be rewarded in Oliver’s last will. Mr. Lee alleged that his services were well worth the amount he was claiming and that he was not mentioned in the will of the deceased. He prayed that he be recognized as a creditor of the succession for the sum of $8,266, less a credit of $115, which deceased had paid him.
 

 The executor and all the legatees under the will filed answers to the opposition in which they denied in toto opponent’s allegations, and pleaded prescription of one, three, five, and ten years. The trial judge overruled these pleas and on the merits rendered judgment in favor of Lee, the opponent, for $1,838, less $115 paid by Oliver. This allowance was based upon the finding by the trial judge that Lee’s services to Oliver were continuous from September 30, 1924, to the date of Oliver’s death on October 23, 1934, or 3,676 days, and that his services were worth on an average of 50 cents per day. The executor and legatees appealed, and opponent answered the appeal, praying that the judgment be increased to the amount claimed.
 

 On the merits the judgment is amply supported by the testimony. Mr. Oliver died at the age of seventy-seven years, according to the testimony of Mr. Lee. For several years prior to his death he was rather feeble in body due to disease and the excessive use of intoxicating liquors. He lived in a section of Shreveport inhabited principally by colored people and seems to have been abandoned in a large measure by white people. He seems to have been a man of some business ability, as evidenced by the fact that he had accumulated considerable property, consisting partly of small residences which he leased to colored tenants. He owned also certain property on Texas avenue and some on Travis street, these being commercial districts, and some in what is known as the Carter subdivision, and had nearly $4,000 to his credit in a bank.
 

 The testimony as a whole indicates that Mr. Oliver realized that he needed some one to look after and protect his person and to advise and assist him in the management of his business. He frequently became so intoxicated that he needed assistance in going from the streets to his home. There is testimony in the record to the effect that he was afraid to risk his own judgment in business matters — that he realized that he needed some one to lean upon.
 

 Mr. Lee, the opponent, moved from Kentucky to Shreveport in May, 1923, and immediately engaged in the secondhand furniture business in the immediate vicinity of Mr. Oliver’s residence. It appears that Mr. Lee is a man of some education and considerable experience, having served eight years as county clerk in Kentucky. He and Mr. Oliver soon became friends; Mr. Lee testified that Mr. Oliver “seemed to want to attach himself to me”; that he soon began to ask advice and assistance. Mr. Lee says that he told Mr. Oliver that
 
 *31
 
 he would gladly render him such assistance both to his person and in his business as he could; that the services requested by Mr. Oliver soon became somewhat burdensome to him; and that he suggested to Mr. Oliver that he should receive some remuneration therefor. He says that Mr. Oliver agreed that he should be compensated, but aslcéd that the matter of compensation be left in abeyance; that nearly two years later he again brought up the question of payment for his services; and that Mr. Oliver then told him that in lieu of cash payments he would “take care of him (Lee) liberally in his will.” He says that he continued to render services for Mr. Oliver, almost daily, on down to the date of Mr. Oliver’s death, in the belief, induced by Oliver’s statements, that he would be made a legatee in Oliver’s will for an amount sufficient to compensate him for all his services.
 

 To corroborate his own testimony that Mr. Oliver promised to “reward him (Lee) liberally in his will,” opponent introduced two witnesses, Howard Brown and J. L. Brown. Howard Brown testified that Mr. Oliver told him in 1927 that Mr. Lee had been looking after his (Oliver’s) business fot four or five years, and that if he continued to do so he would “remember him in his will.”
 

 J. L. Brown testified that he had known both Mr. Oliver and Mr. Lee for a number ■of years and had frequently visited Mr. Lee’s place of business. He said that on numerous occasions he had heard Mr. Oliver call on Mr. Lee to render such services as leasing houses, collecting rents, looking after the purchasing of materials for repairing houses, and looking after repairs generally. He testified that he himself was at one time a tenant of Mr. Oliver’s and that he fell behind with his rent, and asked Mr. Oliver if he could not render him some service in order to help pay his rent. The following extract from Mr. Brown’s testimony is pertinent, and we quote it:
 

 “Well, ,1 asked Mr. Oliver for a job. I had been renting from him, got behind with my rent and I asked him for something to do and he said most of his work was done by negroes. I told him that I might collect rents for him and he said he had engaged Mr. Lee. Mr. Lee was his authorized agent and that he intended to take care of Mr. Lee’s wages in his will, thaj they had an understanding to that effect and he did not need my services.”
 

 Mr. Brown testified that Mr. Oliver told him on another occasion that Mr. Lee was his authorized agent, and that instead of his paying Mr. Lee for his services as they were rendered, he expected to remember Mr. Lee in his will. He testified that on one occasion Mr. Lee was present when Mr. Oliver made that statement to him.
 

 These are the only witnesses called by the opponent to corroborate his own testimony that Mr. Oliver had said that he expected to reward him by making hirn a legatee under his will. But numerous witnesses testified that to their personal knowledge Mr. Lee had rendered services for Mr. Oliver for many years. The testimony conclusively shows that Mr. Oliver habitually called upon Mr. Lee to collect rents for him, to look after his tenant houses, to
 
 *33
 
 purchase material for making repairs, and to supervise generally the work of keeping up his buildings. Numerous witnesses testified that they had seen tenants pay sums to Mr. Lee and had heard them say that the sums paid were for rent due to Mr. Oliver. A colored man named Roberson testified that he'had been a tenant in one of Mr. Oliver’s houses for a number of years and that he had paid his rent regularly to Mr. Lee, who issued receipts therefor in the name of Mr. Oliver. He produced in court 32 receipts bearing different dates from January, 1931, to October, 1934, reading as follows: “Received of Sam Roberson -Dollars, rent due Ben Oliver.” Signed Charles W. Lee.
 

 Other witnesses testified that they were then or had been tenants of Mr. Oliver’s, and that Mr. Lee had collected rents from them. Other witnesses testified that they had always paid their rents to Mr. Oliver in person.
 

 A number of witnesses were called who testified that they had frequently visited Mr. Lee’s place of business and invariably found Mr. Oliver there, and that on numerous occasions they had heard Mr. Oliver call upon Mr. Lee to render services for him, and that at times when Mr. Oliver was absent from Mr. Lee’s place of business they had seen different persons making payments to Mr. Lee and heard them state at the time that the amounts paid were due Mr. Oliver, and that they had seen Mr. Lee issue receipts therefor in the name of Mr. Oliver.
 

 One witness testified that on one occasion he had suggested to Mr. Oliver that he erect a garage building on Texas avenue, and that Mr. Oliver stated to him that Mr. Lee was his authorized agent, and that he would not consider the proposition until after consulting Mr. Lee. Mr. Oliver stated on numerous occasions to those who spoke to him about his business that Mr. Lee was his agent and assisted him generally in looking after his affairs. The executor and the legatees called five witnesses, Rabun, Addison, Rosenblath, Monsour, and Blumfield, each of whom was well acquainted with deceased, saw him frequently, had business transactions with him, but had never known Lee to perform any services for Oliver and had never heard Oliver say that Lee was his agent. Their testimony is negative and does not contradict that of Lee and his witnesses. We are convinced that the trial judge was correct in his finding: First, that Mr. Lee, the opponent, rendered valuable services for Mr. Oliver and that he was not remunerated; and, second, that Mr. Oliver had promised Mr. Lee that he would be liberally rewarded in his will. There is no testimony in the record to show just what these services were worth. No agreement as to the value of the services was ever reached between Mr. Oliver and Mr. Lee. From the testimony before him the trial judge reached the conclusion that 50 cents per day would be sufficient remuneration for these services, and we shall not disturb his judgment in that respect. ■
 

 The action brought by the opponent, Lee, is one on quantum meruit against the succession of Oliver for continuous services rendered by him for Oliver during a
 
 *35
 
 period of years ending when Oliver died. The action is grounded upon the proposition that one who renders valuable services for another continuously for a series of years on the promise of the one benefited that compensation for such services will be provided for in the last will of the person receiving the benefits of such services, and where the promisor dies without making such provision, an action may be maintained for the value of such services against the succession of the deceased. The following cases, and possibly others, support the claim of Lee on this point: Nimmo v. Walker, Executor, 14 La.Ann. 581; Succession of Mrs. Anna McNamara, 48 La.Ann. 45, 18 So. 908; and Succession of Palmer, 137 La. 190, 68 So. 405, 407.
 

 The opponent was unable to establish his claim by any written or documentary evidence and offered only parol testimony to prove it. Counsel for the executor and the legatees under the will objected to the introduction of this character of evidence to establish the debt, on the ground that parol testimony is not admissible to prove any debt or liability on the part of a deceased person.
 

 The objection urged by counsel is not well founded, and the trial judge properly overruled it. The suit to establish the claim was instituted in less than twelve months after the death of the deceased and, under Act No. 207 of 1906, as amended and re-enacted by Act No. 11 of 1926, a debt or liability on the part of a deceased person may be proved by the testimony of the plaintiff, and the testimony “of at least one credible witness of good moral character, besides the plaintiff” (section 2), provided the suit is brought within one year of the date of the death of the deceased, and this suit was brought within one year. Hava v. Cafiero, 157 La. 1007, 103 So. 294; Succession of Williams, 159 La. 814, 106 So. 314; Succession of Coreil, 177 La. 568, 148 So. 711; Succession of Harris, 177 La. 1049, 150 So. 14.
 

 In the Cored Case plaintiff’s claim against the succession was not allowed because his testimony was not corroborated, and in Succession of Harris the claim was rejected because the suit was not filed within one year from the death of deceased.
 

 In the case at bar, plaintiff’s testimony is corroborated, not by one, but by numerous witnesses whose credibility and moral character were not questioned either by the executor or the legatees. Plaintiff testified that he had rendered services continuously for Mr. Oliver from 1923 until he died in October, 1934, and that his services were not gratuitous, as was well understood by Oliver, and that early in 1924 he had an understanding with Oliver to the effect that he (Lee) was to continue his services and that he should be remunerated therefor, but not until after Oliver’s death, arid then by way of a legacy which Oliver agreed to establish in his last will.
 

 Two witnesses testified that Oliver told them that he expected to reward Lee by remembering him in his will, one of them saying that Oliver said this to him in Lee’s presence. A dozen or more witnesses testified that Lee rendered the services.
 

 We are not unmindful, of the rule stated by this court in many cases that stale
 
 *37
 
 claims made against successions are to be viewed with suspicion and that the testimony of the claimant to establish them should be received with greatest caution. Caldwell v. Turner, 129 La. 19, 55 So. 695. Thé reason for this is so apparent that comment is unnecessary. But in the present case the claimant’s testimony is so well corroborated that we have no doubt of the verity of the claim.
 

 On the Pleas of Prescription.
 

 The executor and the legatees plead prescription of one, three, five, and ten years. These pleas are not good except as to the amount claimed by Lee, which he says accrued prior to the date on which Oliver agreed that he would provide for the remuneration in his will. The trial judge rejected opponent’s demand for services rendered prior to that date. The reason that the plea of prescription is not good is that the debt was not due and demandable until after Oliver’s death. Lee had no right of action until then. Prescription does not begin to run until a right of action has accrued. Gueno et al. v. Soumastre, 1 La.Ann. 44; Bryan v. Day, 11 La.Ann. 601; Jones v. Texas & Pacific Railway Co., 125 La. 542, 51 So. 582, 136 Am.St.Rep. 339; Succession of Mereno, 161 La. 84, 90, 108 So. 133.
 

 This case is like that of Nimmo v. Walker, Executor, 14 La.Ann. 581, where the court said: “These promises had reference to the period of Woodruff’s death; and it is but just and proper, to view prescription as suspended until that time.” To the same effect, see Copse v. Eddins, 15 La.Ann. 528.
 

 In Succession of Palmer, supra, the court held that opponent’s claim was prescribed except as to that for the last year’s services. But that was because the court found that all the deceased ever said about remuneration was that he would “divide” with her. The court said: “What appears by the record is that she might at any time, down to the very last breath of the decedent, have demanded immediate payment for her services; but that she continued to acquiesce tacitly in the promise of the decedent to divide with her; no time being fixed, either expressly or tacitly, for the making of this division, but she understanding that, in view of the stinginess of the decedent, it would be in his will.” The court considered the argument of counsel in that case that prescription did not begin to run until the death of deceased, as held in Nimmo v. Walker and Copse v. Eddins, supra, and said: “But this would be true only if there had been a contract that she should be paid then and not sooner. Such a contract, however, is not shown by the record, as has already been stated. All that appears is that there was an understanding that compensation should be made —the time thereof unfixed. As already stated, the opponent might at any time have demanded immediate payment.”
 

 Opponent in the present case could not have demanded payment at any time, and therefore prescription did not begin to run until the death of Mr. Oliver.
 

 For the reasons assigned, the judgment appealed from is affirmed, with costs.