HIGGINS, Justice.
 

 The plaintiff instituted this suit against the succession of his brother to compel the executor to deliver to him 200 shares of no par value of the capital stock of the Reuter Seed Company, Inc., and, in the event of failure to do so, for judgment for its value in the sum of $36,364, with legal interest from date of judicial demand until paid. The action is predicated upon a written agreement signed by the two brothers, reading as follows:
 

 “June 18, 1934.
 

 “This is an agreement between Louis B. Reuter a'nd J. Richard Reuter wherein Louis B. Reuter agrees to assign and dethousand Dollars liver to J. Richard Reuter twenty /-shares, of the Capital Stock of the newly organized Reuter Seed Co., out of his, Louis B. Reuter’s eighty share allotment.
 

 “The consideration for these twenty shares, which is herein acknowledged, consists of much personal and financial assistance and cooperation rendered to Louis B. Reuter and to the Reuter Seed. Company during the many years since its organization, especially during the years the Reuter Seed Company was located in main headquarters at 1033 Decatur St., and especially also during the period of many months prior to Receivership.
 

 “In order that Louis B. Reuter shall be assured of continued active control and management of the Company’s business, J. Richard Reuter agrees to deliver to Louis B. Reuter his irrevocable voting proxy, at all stockholders and Board of Directors meetings, covering these twenty shares of stock for a period of six years or until such' time as Louis B. Reuter is successful in obtaining a majority of stock in the company.
 

 “(Sgd.) Louis B. Reuter
 

 “J. Richard Reuter.”
 

 The defendant filed an exception of vagueness, pleas of prescription of one, five and ten years liberandi causa, and a plea of three years prescription acquirendi causa, under Article 3476 of the Revised Civil Code. An exception of no cause of action, founded on the plea of prescription of ten years, was filed, and the defendant also pleaded laches.
 

 In its answer, the defendant admitted that the deceased signed the contract but averred (1) that the duplicate original agreement, in the possession of the plaintiff and on which the suit was brought, had been changed without the consent and
 
 *481
 
 knowledge of the deceased by striking out the word “shares” and interlining the words “thousand dollars” so as to make it read “twenty thousand dollars of the Capital Stock” instead of “twenty shares of the Capital Stock”, and that the alteration was a forgery; and (2) that the consideration recited therein was not given or was inadequate as some of the services were rendered to other parties and not to the deceased.
 

 The trial judge overruled the exceptions and the pleas and rendered judgment in favor of the plaintiff as prayed for, and the defendant has appealed.
 

 The exception of vagueness was filed for the purpose of compelling the plaintiff to give the dates on which he is said to have advanced the deceased the sum of $6,000. The petition states that this money was advanced, in cash, from time to time during the year 1931. It appears that the books of the Reuter Seed Company, Inc., showed the dates upon which this alleged money was received and that these records, were in the possession of the defendant. The cash advanced was not the only alleged consideration for the agreement because it was stated that the plaintiff endorsed, with his deceased brother, three notes in favor of the Rogers Bros. Seed Company, a creditor of the Reuter Seed Company, Inc., aggregating about $80,000. The deceased expressly acknowledged the consideration in the agreement, although it was not detailed. The defendant had in its possession records showing the transactions upon which the consideration was founded and, therefore, it was in no way at .a disadvantage or prejudiced in making its defense. The trial court properly overruled the exception.
 

 The pleas of prescription liberandi causa are presented on the theory that the consideration for the agreement was furnished by the plaintiff more than ten years before the institution of the suit. This is a personal action arising ex contractu and not one to recover for the financial assistance given and services rendered and is, therefore, prescribed by ten years from the date of the contract, to-wit, June 18, 1934. The suit was timely brought, having been instituted on 'April 11, 1942.
 

 The plea of three years prescription acquirendi causa is based on the ground that the deceased, Louis B. Reuter, was holding the stock adversely to his brother, the plaintiff, and, therefore, he acquired the ownership of the movables after the lapse of three years from the date of the contract. We have already shown that this is a suit for specific performance of the executory contract for the delivery of certain shares of stock and is a personal action prescribed by ten years. The last paragraph of the agreement shows that the deceased was .in possession of the stock by permission or through the indulgence of the plaintiff and, therefore, possessing the movable property precariously and under the expres.s provisions of Articles 3490 and 3510 of the Revised Civil Code, he did not have the kind of possession through which he had the right to acquire the ownership of the stock by prescription. Jeanfreau v. Jeanfreau, 182 La. 332, 162 So. 3.
 

 We have been referred to the case of State ex rel. Waterman v. J. S. Water
 
 *483
 
 man & Co., 178 La. 340, 151 So. 422, 425. In that case the widow and her deceased husband had been in possession of the stock in good faith as owners for more than three years and some of it for more than ten years and the court held that the three years prescription was effective. Therefore, the case is not apposite here because they were holding the stock as bona fide owners in their own rights adverse to any other party and not for another’s account as here.
 

 The exception of no cause of action, being based on prescription of ten years, is without merit for the same reasons previously assigned by us in connection with that plea.
 

 As to the plea of laches, the six year period of time expressly provided for in the agreement during which the deceased could irrevocably vote the stock did not expire until November 30, 1940, or six years after the reorganization of the corporation on November 30, 1934. The plaintiff’s suit was instituted in less than one and one-half years after November 30, 1940, or on April 11, 1942. It must be remembered that the deceased also had the irrevocable voting proxy until he acquired the majority of stock. He was retaining and holding the stock, in order to insure his control of the corporation, as expressly stipulated in the agreement between the plaintiff and himself. The deceased never notified the plaintiff that he had acquired the majority stock. It is conceded that the corporation never paid a dividend. The deceased had in no way indicated that he was claiming any adverse rights and the plaintiff was carrying out his part of the agreement by letting his brother vote ■ the stock so as to remain in control of the corporation. Immediately after the death of Louis B. Reuter on September 5, 1941, when plaintiff learned that his brother had acquired the majority stock, he made demand upon the executor to deliver the stock to him and his request was refused, resulting in the filing of this suit without delay.
 

 With reference to the contention that the plaintiff was guilty of laches in not collecting for assistance and services rendered his brother or the Reuter Seed Company, Inc., many years ago, we reiterate that this is a suit upon an executory contract and not an action to recover for those services or the money advanced for the account of the deceased or the Reuter Seed Company, Inc.
 

 At the beginning of the trial, the attorneys for the defendant objected generally to the introduction of any parol evidence. The objection was oVerruled. Act 207 of
 
 1906,
 
 as amended and re-enacted by Act 11 of 1926, and the provisions of Article 2276 of the Revised Civil Code were invoked. As the suit was instituted within twelve months after the date of the death of the deceased, under the express provisions of Section 2 of the amending statute, parol evidence consisting of the testimony of at least one creditable witness of good moral character, besides the plaintiff, and testimony to corroborate the written acknowledgment or the promise to pay signed by the debtor, are admissible. Succession of DeLoach (DeLoach et al. v.
 
 *485
 
 DeLoach), 204 La. 805, 16 So.2d 361; Succession of Sterkx v. Sterkx, 193 La. 322, 190 So. 568; Succession of Oliver, 184 La. 26, 35, 165 So. 318; Succession of Williams, 159 La. 814, 106 So. 314 and Hava v. Cafiero, 157 La. 1007, 103 So. 294.
 

 With reference to the objection to the testimony under Article 2276 of the Revised Civil Code, we observe that the defendant’s attorneys say that the agreement is uncertain. Therefore, it is ambiguous and required interpretation and parol evidence was admissible to explain the agreement and to prove the intention of the parties to it. The parol evidence introduced by the plaintiff was consistent with the agreement and not offered for the purpose of altering, contradicting, varying, enlarging, or restricting it. The ruling of tjie trial judge in permitting the introduction of parol evidence under these circumstances is correct. Catherine Planting & Mfg. Co. v. Pointe Coupee Trust & Savings Bank, 160 La. 963, 107 So. 711; Widow R. Barnebe v. Mrs. Suaer et al., 18 La. Ann. 148; Succession of Guillory, Opposition of Heirs, 29 La.Ann. 495; and North River Ins. Co. v. Becnel et al., 5 Cir., 33 F.2d 231.
 

 It is elementary that in construing a contract to determine the intention of the parties thereto, the agreement as a whole must be considered, in order to give effect to all of the provisions therein contained, so as to avoid neutralizing or ignoring any of them or treating them as surplusage. Rock Island, Arkansas & Louisiana Railroad Co. v. Gourney et al., 205 La. 125, 17 So.2d 8, and authorities therein cited.
 

 The contract in question was executed in duplicate originals, each brother retaining one of them. The one produced by the plaintiff has the change in it but the other one found in deceased’s bank box does not. We shall first consider the agreement without the alteration and interlineation, independently 'of any documentary evidence and testimony introduced for the purpose of explaining it. The contract expressly states that “ * * * Louis B. Reuter agrees to assign and deliver to J. Richard Reuter twenty shares of the Capital Stock of the newly organized Reuter Seed Co., out of his, Louis B. Reuter’s eighty share allotment.”
 

 Black’s Law Dictionary (3d Ed.) defines “allotment” as “a share or portion; that which is allotted; * * * apportionment, division; the distribution of * * * shares in a public undertaking or corporation.” See, also, Webster’s New International Dictionary (2d Ed.) ; 1 Bouv.Law Diet., Rawle’s Third Revision, p. 181; and Cyclopedic Law Dictionary 3d Ed.
 

 It is noted that the contract does not state that Louis B. Reuter agrees to assign and deliver to J. Richard Reuter 20 shares of capital stock of the newly organized Reuter Seed Company but it does expressly stipulate that the 20 shares of stock are assigned and will be delivered out of Louis B. Reuter’s 80 share allotment. Thus, it appears that Louis B. Reuter was to receive an 80 share allotment of the capital stock of the newly organized
 
 *487
 
 Reuter Seed Company, and he obligated himself to transfer and deliver 20 shares of his 80 share allotment to J. Richard Reuter. This is made clearer when we consider the third paragraph of the agreement whereby J. Richard Reuter expressly agreed to give to Louis B. Reuter “his irrevocable voting proxy, at all stockholders and Board of Directors meetings, covering these twenty shares of stock for a period of six years or until such time as Louis B. Reuter is successful in'obtaining a majority of the stock in the company. * * * In order that Louis B. Reuter shall be assured of continued active control and management of the Company’s business.” It is, therefore, clear that the 80 share allotment of the capital stock of the newly organized Reuter Seed Company was the controlling stock in the corporation and Louis B. Reuter was seeking to protect and preserve his active control and management of the company’s business by having J. Richard Reuter’s irrevocable voting proxy of the 20 shares of the capital stock of the newly organized Reuter Seed Company out of his, Louis B. Reuter’s, 80 share allotment.
 

 If the words “eighty share allotment” are to be interpreted to mean more than 80 shares of stock, then, necessarily, the parties by using the words “twenty shares of stock” out of the 80 share allotment intended that J. Richard Reuter’s percentage of whatever the “eighty share allotment” amounted to would be one-fourth thereof. It would be manifestly unjust to J. Richard Reuter to destroy the proportionate interest in the corporation as stated by the parties themselves through holding that J. Richard Reuter would merely get 20 shares of stock instead of 20 shares of stock out of Louis B. Reuter’s “eighty share allotment”. If Louis B. Reuter had been merely parting with 20 shares of stock, it might well be that the remainder of his 80 share allotment would still have been sufficient to give him control of the corporation and, therefore, there would have been no necessity for him to bind his broth-, er to give him the irrevocable voting proxy of those 20 shares. On the other hand, since Louis B, Reuter was transferring 20 shares of his 80 share allotment or one-fourth or 25% thereof, it is obvious that this would be a substantial amount of stock and would result in him losing the controlling interest in the corporation and, therefore, the reason why the provision was placed in the contract whereby J. Richard Reuter granted Louis B. Reuter the irrevocable proxy to vote those 20 shares of stock of his 80 share allotment.
 

 Surely, it is unreasonable to say that the parties intended that merely 20 shares of stock and not 20 shares of stock out of the 80 share allotment were assigned to J. Richard Reuter in view of the fact that Louis B. Reuter was granted a period of six years and such additional time as he might need to secure sufficient stock to give him majority control of the corporation, and, in the meantime, was to have the irrevocable voting proxy of those shares. If just 20 shares of stock were intended, then it is quite evident that Louis B. Reuter would not have required that long and practically an indefinite period of time to acquire merely 20 shares of
 
 *489
 
 stock, whereas, if 20 shares of stock out of the 80 share allotment or one-fourth thereof were intended as the contract in so many words states, then the period of time granted Louis B. Reuter to procure sufficient stock to give him control of the corporation is entirely reasonable and logical. As Louis B. Reuter admits in the agreement itself that both he and the Reuter Seed Company were financially embarrassed and were required to accept financial help from J. Richard Reuter, necessarily Louis B. Reuter was seeking to protect himself by providing a long period of time in which to acquire the controlling stock in the newly organized company, because he was financially embarrassed and wanted sufficient time to recover.
 

 If the parties intended merely the transfer of 20 shares of stock, they would have so provided in the contract and that would have been the easy and simplest way of expressing their intention. To say that they meant to deal with 20 shares of stock only would make the words “out of his, Louis B. Reuter’s eighty share allotment” useless and unnecessary, unless it be said that the parties were merely showing the source from which the 20 shares of stock were to come. If the first paragraph of the agreement is isolated from the rest of it, and made to stand alone, then that interpretation might be reasonable. But we cannot ignore the third paragraph of the contract, which is definitely linked to the first one by the parties providing that Louis B. Reuter shall have the irrevocable voting proxy “covering these twenty shares of stock”. Necessarily, these two paragraphs must be construed together in determining the real intention of the pa'rties.
 

 On the face of the agreement, it appears that Louis B. Reuter had an “eighty share allotment” of the capital stock of the newly organized Reuter Seed Company. He knew this allotment of stock was the controlling interest ip the newly organized corporation and recognized that the 20 shares out of his 80 share allotment, which he agreed to assign and deliver to his brother, would deprive him of the majority stock or controlling interest and the only way he could assure his continued active control and management of the company’s business was to provide for the irrevocable voting proxy of the stock in his favor. If the 20 shares of stock out of his 80 share allotment- was insufficient to destroy his controlling interest, it would have been a useless and vain thing to provide for the irrevocable voting proxy thereof for six years or until he. could have acquired enough stock to have control of the corporation. Consequently, it cannot be said that the stipulation “out of his, Louis B. Reuter’s eighty share allotment” was a mere designation of the source from which the 20 shares of stock assigned to J. Richard Reuter were to come. The parties fixed the percentage of their respective holdings on a basis of 20 shares of 80 shares of stock and this ratio could not be changed in favor of Louis B. Reuter by increasing the iiumber of shares of stock of the corporation without a pro rata increase in the number of shares of stock for J. Richard Reuter. Otherwise by simply increasing the number of shares of
 
 *491
 
 stock of the corporation Louis could practically deprive Richard of his interest in the corporation.
 

 It is conceded that Louis B. Reuter signed the agreement in which he admitted that “The consideration for these twenty shares, which is herein acknowledged, consists of much personal and financial assistance and co-operation rendered to Louis B. Reuter and to the Reuter Seed Company during the many years since its organization, especially during the years the Reuter Seed Company was located in main headquarters at 1033 Decatur St., and especially also during the period of many months priqr to Receivership”. From this paragraph of the contract we gather that the Reuter Seed Company and Louis B. Reuter needed financial assistance, which was furnished by J. Richard Reuter. It appears that the corporation was in bad financial condition and J. Richard Reuter assisted and co-operated with Louis B. Reuter to help him and the corporation, which subsequently went into receivership. It is obvious that Louis B. Re.uter was fully cognizant of the nature and kind of financial assistance and the co-operation rendered by his brother to himself and the company and acknowledged, in writing, that the 20 shares of his 80 share allotment were assigned and delivered in consideration therefor. While it is true this is a general description of the consideration given, it is clear that Louis B. Reuter considered it sufficiently valuable to himself and the company to assign and deliver the stock in return for his brother’s financial help and services.
 

 There is no defense that the unaltered contract was not voluntarily entered into by Louis B. Reuter or that he was not fully apprised of the affairs of the corporation as well as his own and, therefore, committed error in signing it. In fact, it is. conceded that the unaltered agreement produced in evidence by the defendant is the real contract between the parties. Consequently, the consideration recited in the agreement must stand unless the defendant can prove its defense that there was no consideration given.
 

 We shall next consider the documentary evidence introduced by both litigants to determine what was Louis B. Reuter’s 80 share allotment of the capital stock of the newly organized Reuter Seed Company and what was the specific financial assistance and co-operation rendered to Louis B. Reuter and the Reuter Seed. Company by J. Richard Reuter.
 

 There is an undated agreement between all of the shareholders of the proposed reorganized Reuter Seed Company, Inc., including Louis B. Reuter and J. Richard Reuter. The defendant does not deny that Louis B. Reuter signed this agreement and does not attack the correctness of the statements therein contained. The parties state therein that the Reuter Seed Company, Inc., is in the hands of the receiver in the United States District Court for the Eastern District of Louisiana; that Louis B. Reuter is the President and principal stockholder of the corporation; that, in order to take the corporation out of the hands of the receiver, an offer of settlement is made to the creditors of 20% of
 
 *493
 
 the present claims against it, payable 5;% cash, and 5% each year for 1, 2 and 3 years after date, with interest, represented by the notes of the corporation, which are to be endorsed personally by Louis B. Reuter; that the corporation is indebted to Rogers Brothers Seed Company of Chicago, Ill., in the sum of $80,000, which indebtedness is guaranteed by the personal endorsements of Louis B. Reuter and J. Richard Reuter; that Mrs. Chris Reuter (mother of the Reuter brothers) and Louis B. Reuter are to surrender and cancel their claims against the corporation amounting, respectively, to $82,039.99 and $7,126.34 (representing cash advanced to the company to help it), in order that the settlement may be made with the creditors and bondholders and the receivership dismissed; that it was highly to the advantage of all of the stockholders of Reuter Seed Company, Inc., that the above be accomplished; that, therefore, it was agreed between Louis B. Reuter (owner of 1496 shares), J. Richard Reuter (owner of 495 shares), Chris Reuter, Jr. (owner of 485 shares), James V. Reuter (owner of 485 shares) and Mrs. Chris Reuter (owner of 20 shares) as owners of all of the outstanding issued shares of stock of the corporation that, in consideration of Mrs. Chris Reuter and Louis B. Reuter cancelling their claims against the corporation and Louis B. Reuter personally obligating himself on the notes given for the balance due under the compromise settlement on the claims of the ordinary creditors, the capital structure of the corporation, after the receivership is dismissed, shall be reduced to $150,000 and that all of the stockholders shall surrender the stock presently owned by them and receive of the total of $150,000 capital stock of the corporation the following-: Louis B. Reuter — $80,000; Mrs. Chris Reuter — $20,000; J. Richard Reuter — $10,000; Chris Reuter, Jr.- — $10,-000; and James V. Reuter — $10,000; that the remaining $20,000 of the total of $150,-000 is to be used by Louis B. Reuter in giving as much thereof, or the whole, if necessary, to Rogers Bros. Seed Company, in consideration of their releasing the personal endorsements of Louis B. Reuter and J. Richard Reuter of the obligation of the Reuter Seed Company, Inc., to them, and, in the event Louis B. Reuter is able to obtain the release of the endorsements of himself and his brother from Rogers Bros. Seed Company, for less than $20,000 of the capital stock, any amount of the stock that is not given to Rogers Bros. Seed Company shall be given to Louis B. Reuter and placed in his name in full ownership.
 

 It will be noted that according to the plain provisions of this agreement, Louis B. Reuter’s allotment of the capital stock in the proposed reorganized Reuter Seed Company was to be $80,000. This agreement does not set forth into how many shares of stock the proposed $150,000 of capital stock will be divided. While it is true, this document is not dated, there can be no doubt .that it was in existence on June 18, 1934, when the agreement was entered into between Louis B. and J. Richard Reuter, because the parties therein stipulate with reference to the newly
 
 *495
 
 organized Reuter Seed Company that Louis B. Reuter is to receive an 80 share allotment of the capital stock thereof. This provision undoubtedly and necessarily refers to the $80,000 of the $150,000 of the capital stock that Louis B. Reuter was to receive, according to the undated agreement. The ownership of $80,000 of stock of a corporation with a capital stock of $150,-000 obviously gives the holder thereof the controlling interest. If Louis B. Reuter were only assigning and transferring to J. Richard Reuter 20 shares of stock at $100 per share or $2,000 of $80,000 of stock, he manifestly would be retaining 780 shares of stock or $78,000 of stock, which would still be the controlling interest. However, if he were transferring not merely 20 shares of stock but “twenty shares of the Capital Stock of the newly organized Reuter Seed Co., out of his, Louis B. Reuter’s eighty share allotment”, then, clearly, he realized that he was parting with sufficient stock to lose the controlling interest and, therefore, the reason and necessity for providing that he must have the irrevocable voting proxy of this stock for six years or until such time as he was successful in obtaining a majority of stock in the company.
 

 The charter of the company in the form of a notarial act dated November 30, 1934, provides that the capital stock of the corporation shall consist of 1500 shares of no par value, which is appraised and valued by the stockholders at $100 per share, or a total of $150,000. ' This document tends to further show that the undated agreement was in existence prior to the time that the parties appeared before the notary and is entirely consistent with its provisions, except that the number of shares of capital stock is stated therein.
 

 From a resolution passed by all of the stockholders on November 30, 1934 and annexed to the charter, it appears that the number of shares of stock that each of the stockholders owned prior to the corporation being placed in the receivership is identical with the statement on that matter contained in the undated agreement between the parties, except that Louis B. Reuter placed three shares of stock in the names of three of the employees of the company. The resolution further provides that the 1500 shares of no par value capital stock is to be divided among the parties, as follows : Louis B. Reuter, 977 shares (which includes the $20,000 of the stock which he was authorized to place in his name in full ownership in the event he successfully settled the account of Rogers Bros. Seed Company, less the 3 shares he placed in the names of John O. Luper, Peter D. Nielsen and Oscar R. Jacobson, respectively). Mrs. Chris Reuter received 200 shares and J. Richard Reuter, Chris Reuter, Jr., and James V. Reuter each received 100 shares. Now, by comparing the number of shares which each of these parties (except Luper, Nielsen and Jacobson) received in the reorganized company under the resolution with the amount of the capital stock they were to receive in accordance with the tin-dated agreement, it appears that the number of shares that each would obtain either under the undated agreement or the resolution of the stockholders, was identical.
 
 *497
 
 The only difference between them is that in the undated agreement, the proportionate interest of each is expressed in dollars, whereas in the resolution of the stockholders, the number of shares of each is set forth. Since the stockholders themselves .appraised the no par value stock at $100 per share the result of the distribution of the stock among the shareholders either under the agreement'or the resolution is the same.
 

 It is also important to observe that Louis IB. Reuter and John O. Luper, as President .and Secretary-Treasurer, respectively, of the reorganized corporation, signed the notarial act or charter of the company and participated in the stockholders’ meeting at which the resolution authorizing them to act for the stockholders was passed.
 

 After some correspondence between Louis B. Reuter and Rogers Bros. Seed Company, during May 1934, concerning the proposed 20% settlement of the creditor’s ■claim, Rogers Bros. Seed Company wrote Louis B. Reuter, on June 4, 1934, as follows : “In your new reorganization, we want it thoroughly understood that we have .accepted your proposed compromise settlement of the Reuter Seed Co. with its creditors because of our faith in your ability and your determination to carry this plan through to a successful conclusion. This can only be accomplished by your having full authority in the management of the ■operation of your company; this in turn can only be realized by your retaining a ■controlling interest in the reorganized Reuter Seed Co. We feel that your other ■creditors who have accepted your plan of a compromise settlement, have done so for much the same reasons. In speaking for ourselves, we would not have the hope for success of your plan, were the reorganization to be carried out on any other basis, nor would we accept it unless it did carry with it your control and direction of the new company.”
 

 It will be observed that this letter antedated the agreement of June 18, 1934 between Louis B. Reuter and J. Richard Reuter and it clearly shows the third paragraph was inserted in the agreement to insure Louis B. Reuter’s control of the corporation. We repeat for emphasis, if Louis B. Reuter were only parting with 20 shares of stock, which did not affect his controlling interest, the irrevocable voting proxy stipulation would have been unnecessary but it was indispensable if he Were transferring 20 shares of his 80 -share allotment or one-fourth thereof, for then he would be losing the controlling interest in the company.
 

 With reference to the second paragraph of the agreement of June 18, 1934 iovering the consideration furnished by J. Richard Reuter to Louis B. Reuter and the Reuter Seed Company, the documentary evidence conclusively shows that J. Richard Reuter was requested by Louis B. Reuter tó sign and did sign three notes in favor of Rogers Bros. Seed Company, a creditor of the corporation, aggregating in excess of $82,000, making him and his co-endorser, Louis B. Reuter, liable, in solido, therefor. The Reuter Seed Company’s books, which were not' in the possession of J. Richard Reuter, show that from July through De
 
 *499
 
 cember 1931, there was credited to Louis B. Reuter’s account with the corporation various sums aggregating $7,126.34. This money, according to the testimony,' was furnished by J. Richard Reuter to Louis B. Reuter, upon his request, to cover potential overdrafts of the corporation’s bank account.
 

 The plaintiff, J. Richard Reuter, testified that his brother, Louis B. Reuter, and the Reuter Seed Company were in financial difficulties in 1931 and that his brother on several occasions requested money to be deposited in the corporation’s bank account to cover outstanding checks; that the cash advanced was in excess of $6,000; that he' also signed, as co-endorser, the $82,000 notes in favor of Rogers Bros. Seed Company; that the decedent promised him if he assisted and co-operated with him, he (Louis B. Reuter) would assign and deliver a substantial amount of the capital stock of the corporation to him; that when the company was being reorganized in 1934, he and his brother together drew up the agreement of June 18, 1934, in duplicate original and both of them signed each document with Louis B. Reuter’s fountain pen containing green ink, which was the color of ink Louis B. Reuter always used; that upon reading the agreement his .brother struck out the word “shares” and inserted the words “thousand dollars” with green ink on the duplicate original given to J. Richard Reuter and he retained the other duplicate original, which he did not change; that his brother stated the purpose of making the interlineation was to make the agreement clearer; that from July 1931 to the end of the year he-advanced his brother, Louis B. Reuter, upon his repeated requests, sums of money taken from his cash drawer in his safe in his office aggregating approximately $6,000' and that upon his brother asking him to sign as the endorser of Rogers Bros. Seed Company’s notes, he did so, because that creditor would not accept Louis B. Reuter’s endorsement alone.
 

 John O. Luper, the secretary-treasurer and accountant, who worked for a number of years for the Reuter Seed Company before and after its reorganization, and who-received a fine letter of recommendation from Louis B. Reuter when he left the-company’s employment, testified that Louis' B. Reuter discussed with him the reorganization of the company and the agreement that he had made with J. Richard Reuter on June 18, 1934; that the deceased stated that the new corporation would have $150,000 capital of which he-was to have the controlling stock of $80,-000, and that he looked upon the division of the capital stock into a unit of 150’ shares and not 1500 shares at that time; that subsequently when the no par value stock was appraised by the stockholders at $100 per share, it was determined that the number of shares be 1500; that the deceased intended to give his brother one-fourth of his 80 share allotment or $20,000’ of stock in the proposed newly reorganized corporation; that the Reuter Seed Company, Inc., was in financial distress; that he heard Louis B. Reuter telephone J. Richard Reuter on several occasions and request financial assistance, in order to
 
 *501
 
 make bank deposits to cover outstanding checks to prevent overdrawing the corporation’s account; that Louis B. Reuter left the office after the telephone conversations with his brother and later returned with the cash, which was placed to the credit of the corporation’s bank account; and that upon the instructions of Louis B. Reuter, he entered these various cash advances on the corporation’s books to the credit of Louis B. Reuter instead of J. Richard Reuter, as the transactions were private matters between the brothers and that while he had not seen the books in several years, his recollection was that the total amount advanced was between $7,000 and $8,000.
 

 In order to prove that the interlineation of the words “thousand Dollars” in the duplicate original of the agreement of June 18, 1934, retained by J. Richard Reuter, was made in the handwriting of the deceased* the plaintiff placed on the witness stand, Elbridge Stein, who qualified as a handwriting expert. This witness stated that he had carefully and analytically examined the wills of the deceased that were written in his own handwriting and had compared the handwriting therein with the two words interlined in the agreement; and that he made photographic enlargements of words found in the wills and the interlined words in the agreement, and by observing the characteristic manner in which the deceased formed his letters, as well as the fact that the interlineation was written in a hurried and free way, he was of the positive opinion that the interlined words were in the handwriting of the deceased. In a very lengthy direct and cross-examination, the witness demonstrated to the court the characteristics which were peculiar to the deceased’s handwriting and states that his opinion was predicated thereon. He admitted that the letter “D” in the word “Dollars” interlined in the agreement was formed differently from the “D’s” found in the wills but pointed out that the deceased, contrary to the usual way of forming his “t’s” by an upward and downward stroke, sometimes made the letter “t” by a downward stroke only. He was confident that if he had a sufficient amount of material written in the deceased’s handwriting, he could show to the court that the deceased also wrote the letter “D” sometimes in the same manner in which he formed the “D” when he wrote “Dollars” in the agreement.
 

 The defendant placed on the stand S. F. Von Ehren, who also qualified as a handwriting expert. He emphasized the fact that the “D” in the interlineation of the word “Dollars” in the agreement was not formed in the way that the deceased wrote it in the wills and that the letters “ars” in the word “Dollars” trawled off into a quick finish. He was of the opinion that the interlined words were not written by the deceased. He agrees with Mr. Stein that the interlined words were written fluently or without precision and then states that whoever wrote the words “thousand Dollars” was no forger by practice because a forger would have taken time to study each individual letter to make positive that no part of the writing would remain in doubt.
 

 
 *503
 
 On cross-examination the following questions were propounded to and answered by-Mr. Von Ehren:
 

 “Q. Did you check to see whether this eminent expert from New York had made any mistake? A. No, in those particular things he has not made mistakes, he shows those S’s are photographed from the document, but we can prove that all the other S’s are entirely different.
 

 “Q. Do you agree with Mr. Stein’s statement with reference to the photostats, of the words or parts of words he has taken on there, are they in the document ? A. They must be, he photographed them from the document.
 

 “Q. You do not dispute the correctness of the illustrations he gave? A. No, I do not do that.
 

 * *
 
 At
 
 * *
 

 “Q. In other words, let me see if I follow that, your conclusion that the words ‘thousand dollars’ were not written by Mr. Louis Reuter is based upon the proposition that the formation of the letters in that word agree with the rare characteristics as manifested by his genuine writing in the wills, rather than his general characteristics as manifested in those documents, is that right? A. That is what it seems to be.
 

 “Q. And upon that proposition you base your statement in direct examination that it is impossible that those words ‘thousand dollars’ were written by the deceased? A. Exactly.”
 

 Chris Reuter, Jr. (father of the universal legatee under the deceased’s will), who admitted that he was not a handwriting expert, states that in his opinion the interlineation was not in his brother’s handwriting.
 

 It was stipulated that if Peter D. Nielsen, a business associate of the deceased and the executor of his succession, were placed on the stand, he would state that he was not a handwriting expert but that it was his belief the interlined words were not written by the deceased.
 

 In order to contradict the testimony of J. Richard Reuter and John O. Luper to’ the effect that in excess of $6,000 was advanced by J. Richard Reuter to Louis B. Reuter upon his request, the defendant placed upon the witness stand an auditor who had made regular audits of the books of Chris Reuter, Inc., in which Richard had the controlling interest and the mam agement, and he states that during the. year 1931, the audit showed that the company was insolvent. This witness also testified that in 1932, J. Richard Reuter had to make cash advances to Chris Reuter, Inc., in order that it could meet its creditors’ demands ; and that this corporation was. placed in the hands of a receiver in 1935 and liquidated, the secured creditors being paid in full, the ordinary creditors receiving 20 cents on the dollar, and the stockholders (consisting of the members of the Reuter family, including Louis B.) taking a total loss. This witness and Peter D. Nielsen also testified that the deceased had never discussed with them the agreement dated June 18, 1934 and that John O. Luper and J. Richard Reuter were not in the good.
 
 *505
 
 graces of Louis B. Reuter for several years prior to his death.
 

 In order to show that J. Richard Reuter, personally, was in financial distress, the defendant introduced in evidence Richard’s note for the sum of $500 in favor of the Whitney • National Bank .that Louis B. Reuter had endorsed for him in 1938. It will be observed this was three years after Chris Reuter, Inc., went into receivership and was liquidated.
 

 In rebuttal, J. Richard Reuter testified that while his corporation in 1931 had sustained severe losses, the auditor’s report showed that it was not insolvent and had' assets valued in excess of $100,000 above its liabilities. He also states that during that time he Was not personally without means, having a $15,000 unencumbered home, life insurance and stocks. He denied that he and his brother were hostile to each other and stated their relations were cordial.
 

 It is significant that the auditor himself pointed out that J. Richard Reuter advanced Chris Reuter, Inc., several thous- and dollars in 1932. This shows that J. Richard Reuter was not without funds and corroborated his and Luper’s statement that he advanced the cash to his brother Louis during the last six months of the year 1931. The fact that Louis B. Reuter endorsed J. Richard Reuter’s note for the sum of $500 in 1938 corroborates his and Luper’s statement that the two brothers were on friendly terms, otherwise Louis B. Reuter would not have endorsed the note.
 

 It is argued that as all of the members of the Reuter family owned stock in both the Reuter Seed Company in which Louis B. Reuter had the controlling interest and management and Chris Reuter, Inc., in which J. Richard Reuter had the controlling interest .and management, and, as both of these corporations suffered reverses, the financial assistance given and services rendered by Mrs. Chris Reuter, Sr., Louis B. Reuter and J. Richard Reuter to the respective corporations were for the purpose of protecting their interests in them and without any idea of being paid or rewarded therefor. It is also contended that J. Richard Reuter signed as endorser on the notes given to Rogers Bros. Seed Company and advanced cash to Louis B. Reuter in return for similar favors extended to J. Richard Reuter by Louis B. Reuter and not as a consideration for the contract in question. The defendant’s position in this respect is not borne out either by the agreement or the evidence. The contract shows on its face that Louis B. Reuter did not regard his brother’s help as a gratuity nor consider it a return for any favorable considerations he granted J. Richard Reuter or Chris Reuter, Inc.
 

 It was also suggested that Louis B. Reuter might have otherwise settled any claim that J. Richard Reuter had under the contract of June 18, 1934, but there is not any evidence in the record to that effect. On the contrary, the document was found in Louis B. Reuter’s bank box when it was opened through an order of court, after his death, annexed to the certificates, for 1100 shares of stock in the Reuter Seed Company, Inc., together with his will. It is also significant that in his will he dis
 
 *507
 
 poses of 800 shares of stock in trust and instituted his nephew, Wilbur R. Reuter, son of Chris Reuter, Jr., as universal legatee. Therefore, there were 300 shares of the stock that were not specifically disposed of and sufficient stock left to carry out his contract with J. Richard Reuter, as well as to leave his nephew 100 shares of stock in the corporation.
 

 The point is made that if the altered agreement is held to be genuine that it clearly shows that it was the intention of Louis B. Reuter to grant his brother no more than $20,000 of stock and, therefore, all he could recover is the $20,000. We have already demonstrated that under either the altered or unaltered agreement, it was the intention of the brothers that J.- Richard Reuter should have one-fourth of Louis B. Reuter’s 80 share allotment. The mere fact that the stockholders subsequently decided to issue 1500 shares of no par value stock instead of 150 shares could hot change the ratio or the proportionate interest provided for by these two brothers in their agreement. If Louis B. Reuter were permitted to do that, he could have practically defeated J. Richard Reuter’s rights or claim by simply increasing the number of shares of stock of the corporation at the time it was reorganized in November 1934. If, instead of issuing 1500 shares of stock of no par value with a $100 appraisal, the stockholders had issued 15,-000 shares of no par value stock appraised at $10 per share or 150,000 shares of no par value stock appraised at $1 per share, it is readily seen that J. Richard Reuter would only receive the sum of $20 under the last classification.
 

 The mere fact that Louis B. Reuter devoted his time and talent to the corporation for remuneration and at the time of his death had increased the value of his stock to where it had an inventory appraisal of $181.82 per share, does not give his executor the right to claim the $81.82 per share increase in value because as far as the two brothers are concerned the stock belonged to J. Richard Reuter under the executory contract of June 18, 1934 from the date that the stock was issued after the company was incorporated on November 30, 1934, as deceased had acknowledged payment in full for it.
 

 Finally, it is said that the court should deny the plaintiff specific performance of the contract, because he had an adequate remedy at law and waited for several years to determine whether or not the stock increased or decreased in value before invoking this equitable remedy. Cases where a party obtained an option to purchase and was guilty of laches or an unusual delay until a time when the value of the thing sought to be purchased increased in value, before asking for specific performance, and where a contract to purchase was entered into without the consideration being paid and the would-be purchaser waited an unreasonable length of time in order to determine if the value of the object of the proposed sale would increase before demanding specific performance of the agreement are cited by the attorneys for the defendant. Roberts v.
 
 *509
 
 Steelman, 3 Cir., 1 F.2d 180; Johnson v. Johnson, 87 Colo. 207, 286 P. 109; Bahr v. Breeze Corporation, 126 N.J.Eq. 124, 8 A.2d 185; Id., 127 N.J.Eq. 257, 12 A.2d 678; Davison v. Davis, 125 U.S. 90, 8 S.Ct. 825, 31 L.Ed. 635; Pomeroy (3d Ed.) “Specific Performance of Contracts”, Sec. 159, page 402 and Secs. 334, 385, pages 814, 817. These authorities are not in point here as the acknowledged consideration for-the agreement to assign and deliver the stock was fully and completely given by J. Richard Reuter to Louis B. Reuter before the agreement of June 18, 1934 was confected. J. Richard Reuter was not waiting or delaying the matter to determine if the value of the stock advanced or declined, but simply left the shares of stock remain in his brother’s possession and name on the books of the corporation, in order that his part of the agreement granting Louis the irrevocable voting proxy thereon would be carried out and Louis’ rights would be protected. Louis received the full advantage and benefit of the consideration of the agreement up until the date of his death, immediately after which happening this suit was filed. Even if J. Richard Reuter had the shares of stock transferred to his name on the corporation’s books, Louis, in order to protect himself, would have 'had to have the new certificate issued by the corporation covering the same to show that it was subject to the irrevocable voting proxy provision of the agreement. The fact that the stock was not placed in J. Richard Reuter’s name but in Louis’ name did not in any way prejudice Louis’ rights or those of his estate. In fact this was distinctly to his advantage and he used it up until the date of his death in maintaining the control of the corporation. It is now too late for the executor to repudiate the agreement or refuse to carry it out. It is inequitable for him to decline to do so. A suit for damages under the circumstances would not be an adequate remedy because Louis B. Reuter and his estate have had the benefits of the full consideration given by J. Richard Reuter for the stock during these several years.
 

 In this State, specific performance of contracts rests within the sound discretion of the court. Youngblood v. Daily & Weekly Signal Tribune, 15 La.App. 379, 131 So. 604; Blackshear v. Sandifer, 15 La.App. 423, 132 So. 282. The trial judge, in the instant case, ordered specific" performance of the agreement and in default thereof, damages in a sum equal to the appraised value of the stock at the time the inventory was taken of the deceased’s estate.
 

 Our opinion is in accord with the views expressed by the trial judge that in order to give effect to all of the provisions of the unaltered agreement, it must be construed to mean that J. Richard Reuter was entitled to 20 shares of the capital stóck of Louis B. Reuter’s 80 share allotment or one-fourth or 25% of Louis B. Reuter’s allotment of stock in the new corporation; that the evidence shows that the interlineation was made in the agreement in the handwriting of the deceased'; that under the unaltered or altered contract it was the intention of Louis B. Reuter fo assign and deliver to his brother one-fourth of his allotment of shares of stock in the proposed
 
 *511
 
 reorganized corporation; that the correctness of these conclusions is made clear by the documentary evidence and the testimony offered to explain the agreement and to show the real intention of the parties thereto, that one-fourth of Louis B. Reuter’s allotment of 80 shares of stock or 200 shares thereof were assigned to J. Richard Reuter; and that the contract was supported by a valid, valuable and adequate .acknowledged consideration.
 

 For the reasons assigned, the judgment of the district court is affirmed at the appellant’s cost.
 

 ODOM, J., absent.